THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EMMALINE WILLIAMS *et al.*, Defendants-Appellants.

First District (5th Division)   Nos. 1—87—0060, 1—87—0187 cons.

Opinion filed January 27, 1989.—Rehearing denied June 13, 1989.

PINCHAM, J., dissenting.

Gary Ravitz, of Chicago, for appellant Emmaline Williams.

Adam Bourgeois, of Bourgeois & Null, and Mitchell Ware, of Jones, Ware & Grenard, both of Chicago, for appellant Roy Williams.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund and Michael Brown, Assistant State's Attorneys, and Marie Quinlivan Czech, Special Assistant State's Attorney, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

Following a joint bench trial, at which defendants were represented by the same attorney, Roy Williams (defendant) was convicted of rape and sentenced to a 19-year term, and his wife Emmaline Williams (codefendant) was convicted of indecent liberties with a child and sentenced to a 12-year term. In these consolidated appeals defendant and codefendant contend that their joint representation was improper due to their counsel's conflict of interest; that counsel was incompetent; and that improper hearsay evidence was presented at trial. Codefendant raises an additional argument concerning the sufficiency of the evidence to sustain her conviction.

The complainant was 13 years old in 1982 when she was adopted by defendant and codefendant. In 1984 she was living with them and several other children in a Chicago house. Complainant slept in an upstairs bedroom while defendant and codefendant had a bedroom on the first floor of the residence.

Complainant testified that about 9 p.m. on a date in April 1984 complainant was in her bedroom when codefendant called her and asked her to come downstairs. When complainant did, codefendant asked complainant to do her a favor as they both went into the first-floor bedroom. There complainant saw defendant lying naked on the bed. Codefendant then obstructed complainant's exit from the bedroom, removed complainant's clothes and forced complainant onto the bed, where defendant began to sexually molest complainant as codefendant disrobed. At one point complainant was lying on the bed between defendant and codefendant. Defendant eventually got on top of

complainant and raped her as codefendant held one of complainant's hands telling complainant that she loved her. Codefendant then sexually molested complainant both in the bedroom and when complainant went into the bathroom shortly thereafter.

Complainant told the accused's 19-year-old daughter of the occurrence but the latter did not believe her. Two weeks after the incident she addressed a letter, which was presented at trial, to her former foster mother explaining the occurrence, but she did not mail it. In June 1985 complainant left her adoptive parents' home after codefendant beat and tried to sexually molest her, and she returned to the home of her former foster mother, who notified police. She then gave police the letter.

Chicago police officer Joseph Lux investigated the matter and on the evening of June 17, 1985, he arrested codefendant at her home upon serving her with a search warrant. After he advised codefendant of her *Miranda* rights, she waived those rights and told Officer Lux that she was present when defendant had consensual intercourse with complainant. Officer Lux then arrested defendant, and he too waived his *Miranda* rights. Defendant told Officer Lux that codefendant had brought complainant to their bedroom while he was lying naked on the bed. Codefendant instructed complainant to remove her clothes, then both held complainant down on the bed by her arms so defendant could have sexual intercourse with her. Thereafter both forcibly fondled complainant. The substance of this statement was reduced to writing and defendant signed it.

The police then confronted codefendant with defendant's statement. Codefendant told the officer that those events must have occurred if defendant said that they did.

Codefendant testified. She denied that the events recounted by complainant occurred. She also denied making any oral incriminating admissions to police.

Defendant testified. He denied having sexual relations with complainant, and he denied that he knew the contents of the written statement he signed. First, he claimed that Officer Lux told him that codefendant made a written statement, that no one would believe him because he was a black man and that he would receive a substantial sentence. However, if he confessed, Lux told him that he could receive probation. Then an assistant State's Attorney presented him with a written account, which defendant did not read or know its content before he signed, although he told the latter that nothing had occurred with complainant.

Both defendant and codefendant contend that representation by

the same counsel during their joint bench trial was improper because a conflict of interest existed. Codefendant claims that this conflict was manifested by the introduction of defendant's statement without restriction, which implicated her even though repudiated by defendant. She also maintains that because of their joint representation she was not able to fully cross-examine defendant without using information acquired in counsel's professional responsibility to defendant. Defendant claims that prior to trial the court could not have known that a conflict existed with codefendant. Defendant asserts, however, that when codefendant's statement implicating him in the offense was introduced, a conflict was evident, yet the trial court did not inquire into the conflict or admonish both accused that they had a right to be represented by counsel with undivided loyalties.

In *People v. Jones* (1988), 121 Ill. 2d 21, 250 N.E.2d 325, the Illinois Supreme Court considered in consolidated appeals "whether joint representation of defendants establishes a sixth amendment claim of denial of the effective assistance of counsel when it is alleged that the admission of inculpatory and inconsistent pretrial statements from each defendant created a conflict of interest." (121 Ill. 2d at 24.) In neither consolidated case in *Jones,* as here, did defense counsel indicate to the trial court that any potential conflict might exist. One of the consolidated cases involved the appeal of defendant Harris who along with a codefendant Jones was jointly tried for armed robbery. Both defendant and codefendant made pretrial statements; Jones' statement implicated Harris and exculpated himself while Harris' statement exculpated both. At trial Jones denied making his pretrial statement and adopted Harris' version of events. The supreme court noted that Jones had repudiated his earlier inculpatory statement and asserted a claim consistent with Harris' position stating, "Counsel for Harris had no reason to cross-examine Jones when he testified favorably to Harris." (121 Ill. 2d at 31.) Harris' conviction was thus affirmed. In the second consolidated case, defendants Mosley and Ross were jointly represented at trial and both had made pretrial statements inculpating both in murder and armed robbery. Mosley repudiated his statement at trial as coerced, but Ross did not testify. The supreme court found that no hostility existed between defendants because Mosley repudiated his confession and Ross did not have to impeach Mosley because no amount of impeachment could have produced a more favorable result. (121 Ill. 2d at 33.) However, since Ross did not testify and his pretrial confession implicated Mosley, the supreme court concluded that his confession went to the jury unrepudiated and unimpeached, thereby violating Mosley's right to confron-

tation. "[W]hen Ross declined to testify, there was no way that Mosley's attorney [who also represented Ross] could effectively deal with the implicating statement." (121 Ill. 2d at 34.) The supreme court then affirmed Ross' conviction but granted Mosley a new trial.

■ We believe that *Jones* negates the claims in the present consolidated appeals that their counsel operated under a conflict of interest. Codefendant testified and denied making any incriminating statement, and defendant claimed that his written admission was not intelligently made or true. Consequently, we do not believe that defendant or codefendant can establish a meritorious claim that their joint representation was improper because each could not cross-examine the other as to the respective pretrial statements. There was no conflict of interest in the joint representation of which the trial court was required to *sua sponte* advise defendant and codefendant.

Both defendant and codefendant advance claims that they were denied effective assistance of trial counsel. Defendant contends that his counsel was ineffective because counsel (1) failed to question the voluntariness of his confession; (2) failed to prepare adequately for trial by not reviewing the discovery materials tendered by the State, specifically, the letter written by complainant to her foster mother; (3) failed to object to the letter as hearsay; (4) failed to move for a severance when codefendant made a statement implicating him; and (5) failed to prepare adequately for trial by failing to interview witnesses who could describe complainant as an inveterate liar. Codefendant makes similar claims of ineffectiveness based on their counsel's failure to file pretrial motions to suppress statements, to seek a severance, to object to introduction of complainant's letter, to object to certain testimony elicited from the witnesses by the State, or to make any investigations of complainant's medical and school records or call into question her veracity.

■ To establish ineffectiveness of trial counsel defendant must show that counsel's conduct fell below an objective standard of reasonableness under prevailing professional norms and that defendant was so prejudiced by counsel's deficient performance that he was denied a fair trial. (*People v. Harris* (1988), 123 Ill. 2d 113, 155, 526 N.E.2d 335.) In the present case we believe that many of the claimed deficiencies were merely questions of trial strategy. First, a severance could be granted upon a showing of antagonistic defenses. (*People v. Harris* (1988), 123 Ill. 2d 113, 155, 526 N.E.2d 335.) As we have previously noted, the defenses in this case were not antagonistic; both accused denied that the sexual incident ever occurred. Moreover, the questions of pretrial motions to suppress each accused's statements

may well have been a question of trial strategy. See authorities set forth in *People v. Fernandez* (1987), 162 Ill. App. 3d 981, 987-88, 516 N.E.2d 366.

■ There is nothing in Officer Lux' trial testimony to suggest any basis to suppress the statements of defendant or codefendant, and the only question which could have been raised was the credibility of the witnesses. Counsel may well have thought such motions would have been futile. (*People v. Hall* (1986), 114 Ill. 2d 376, 408, 499 N.E.2d 1335; *People v. Hancock* (1983), 113 Ill. App. 3d 564, 574, 447 N.E.2d 994.) Moreover, there was the possibility that had defendant and codefendant testified in a pretrial setting something might have occurred that would have been used to impeach them at trial (see *People v. Sturgis* (1974), 58 Ill. 2d 211, 317 N.E.2d 545) particularly in the case of codefendant who denied making any such statement.

Moreover, we fail to discern any lack of trial preparation by defense counsel that prejudiced defendant and codefendant. The case was quite simple and direct. The case involved complainant's testimony and Officer Lux' testimony about codefendant's oral statements and defendant's oral and written statements as opposed to the denials of defendant and codefendant at trial of these matters. We do not believe that any conduct by defense counsel which is not called into question on appeal affected the outcome of their trial. Consequently, we do not believe that ineffective assistance of counsel has been established.

■ Defendant and codefendant argue that reversible error occurred when complainant's undelivered letter was allowed into evidence detailing the crimes with which they were charged. This letter was merely cumulative in nature to complainant's testimony. That testimony was corroborated as to defendant by his oral and written admissions and corroborated in significant part as to codefendant by the latter's oral admissions to police. Thus, even if the admission of the letter can be questioned, defendant and codefendant cannot claim prejudice. See *People v. Silvertri* (1986), 148 Ill. App. 3d 980, 987, 500 N.E.2d 456.

■ Codefendant urges that she was not proved guilty beyond a reasonable doubt. Viewed in the light most favorable to the prosecution, the evidence does not compel a contrary result. *People v. Bedony* (1988), 173 Ill. App. 3d 613, 618, 527 N.E.2d 916.

In a footnote contained in her brief codefendant makes an abridged reference to the length of her sentence and notes that this court can modify an inappropriate sentence. However, we do not believe that an adequate ground exists for this type of action. *People v.*

*La Pointe* (1981), 88 Ill. 2d 482, 492-93, 431 N.E.2d 334.

Accordingly, the judgments of the circuit court are affirmed.

Judgments affirmed.

COCCIA, J., concurs.

PINCHAM, J., dissenting:

I dissent. However insatiable the urge may be to distort or ignore fundamental constitutional rights and legal principles in order to convict one who is accused of committing a despicable crime, this urge, whenever present, must be completely suppressed and the rules of law must always prevail. A mere cursory examination of the record in the case at bar clearly reveals that the defendants, Emmaline Williams and Roy Williams, were each denied their Federal and State constitutional rights to the effective assistance of counsel by their attorney's simultaneous disloyal representation of the two defendants, who had adverse, antagonistic, inconsistent, discordant and conflicting rights, interests and concerns, and also by their attorney's grossly incompetent and blatantly inadequate performance, before and during the defendants' joint trial.

A

### THE DEFENDANTS' RIGHT TO COUNSEL

The sixth amendment to the Constitution of the United States, made binding upon the States by the due process clause of the fourteenth amendment (*Gideon v. Wainwright* (1961), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792), provides that, "In all criminal prosecutions, the accused shall enjoy the right *** to have the Assistance of Counsel for his defence." (U.S. Const., amend. VI.) Article I, section 8, of the Constitution of the State of Illinois similarly provides that, "In criminal prosecutions, the accused shall have the right to appear and defend in person and by counsel ***." Ill. Const. 1970, art. I, §8.

The Supreme Court held in *Kimmelman v. Morrison* (1986), 477 U.S. 365, 374, 91 L. Ed. 2d 305, 318, 106 S. Ct. 2574, 2583:

> "The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process."

The *Kimmelman* court further held:

> "The right of an accused to counsel is beyond question a fundamental right. [Citations.] ('The right of one charged with

crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours'). Without counsel the right to a fair trial itself would be of little consequence [citations], for it is through counsel that the accused secures his other rights. [Citations] ('Of all the rights that an accused person has, the right to be represented by counsel is by far the most pervasive, for it affects his ability to assert any other rights he may have'). The constitutional guarantee of counsel, however, 'cannot be satisfied by mere formal appointment,' [citation]. 'An accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.' [Citation.] In other words, the right to counsel is the right to effective assistance of counsel." 477 U.S. at 377, 91 L. Ed. 2d at 320-21, 106 S. Ct. at 2584.

The precious constitutional right to the effective assistance of counsel is not governed or influenced by the gravamen of the offense with which the accused stands charged. Nor is this invaluable constitutional guarantee in any way dependent upon the innocence or guilt of the accused, the quantity or quality of the State's evidence against the accused, the evidence of the accused's innocence, or the potential success or failure of the accused's defense. In *Kimmelman*, the Supreme Court additionally held:

"While we have recognized that the 'premise of our adversary system of criminal justice *** that partisan advocacy *** will best promote the ultimate objective that the guilty be convicted and the innocent go free' [citations] underlies and gives meaning to the right to effective assistance [citation], we have never intimated that the right to counsel is conditioned upon actual innocence. The constitutional rights of criminal defendants are granted to the innocent and the guilty alike. Consequently, we decline to hold either that the guarantee of effective assistance of counsel belongs solely to the innocent or that it attaches only to matters affecting the determination of actual guilt." 477 U.S. at 379-80, 91 L. Ed. 2d at 322, 106 S. Ct. at 2585-86.

Moreover, under the criminally accused's constitutional guarantee to the effective assistance of counsel, no distinction is permitted between an accused's court-appointed counsel and an accused's privately retained counsel. Mr. Justice Stevens recently stated for the Supreme Court in *McCoy v. Court of Appeals* (1988), 486 U.S. 429, 444, 100 L. Ed. 2d 440, 457, 108 S. Ct. 1895, 1905;

"Every advocate has essentially the same professional responsibility whether he or she accepted a retainer from a paying cli-

ent or as appointment from a court. \*\*\* In preparing and evaluating the case, and in advising the client as to the prospects for success, counsel must consistently serve the client's intent to the best of his or her ability.

\* \* \*

\*\*\* The attorney must still provide his or her client precisely the services that an affluent defendant could obtain from paid counsel—a thorough review of the record and a discussion of the strongest arguments revealed by that review. In searching for the strongest arguments available, the attorney must be zealous and must resolve all doubts and ambiguous legal questions in favor of his or her client."

Under their Federal and State constitutional guarantee to the effective assistance of counsel, defendants Roy Williams and Emmaline Williams were each entitled to dedicated counsel who was not hobbled and who was unfettered in his representation of each of them by his divided loyalties between them. Civilization's most sacred, learned, dedicated and staunchest advocate of all times, centuries ago, admonished:

"No one can serve two masters; for either he will hate the one and love the other, or he will hold to the one and despise the other." (Matthew 6:24.)

The advocate was the Christ Jesus; the admonition was to his disciples and the multitude during His Sermon on the Mount; the admonition is cited in the most dynamic, accurate and prestigious of all law books, The Holy Bible, at Matthew, the 6th chapter and the 24th verse.

Canon 5 of The Model Code of Professional Responsibility of the American Bar Association demands:

"5—1 The professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compromising influences and loyalties. Neither his personal interests, the interests of other clients, nor the desires of third persons should be permitted to dilute his loyalty to his client.

\* \* \*

5—14 Maintaining the independence of professional judgment required of a lawyer precludes his acceptance or continuation of employment that will adversely affect his judgment on behalf of or dilute his loyalty to a client. *This problem arises whenever a lawyer is asked to represent two or more clients who may have different interests, whether such interests be con-*

*flicting, inconsistent, diverse, or otherwise discordant.*

5—15 If a lawyer is requested to undertake or to continue representation of multiple clients having potentially differing interests, he must weigh carefully the possibility that his judgment may be impaired or his loyalty divided if he accepts or continues the employment. He should resolve all doubts against the propriety of the representation. A lawyer should never represent in litigation multiple clients with differing interests; and there are few situations in which he would be justified in representing in litigation multiple clients with potentially differing interests. If a lawyer accepted such employment and the interests did become actually differing, he would have to withdraw from employment with likelihood of resulting hardship on the clients; and for this reason it is preferable that he refuse the employment initially. \*\*\*
     \*\*\*

5—17 *Typically recurring situations involving potentially differing interests are those in which a lawyer is asked to represent co-defendants in a criminal case* \*\*\*. Whether a lawyer can fairly and adequately protect the interests of multiple clients in these and similar situations depends upon an analysis of each case. \*\*\* [T]he chance of adverse effect upon his judgment is not unlikely." (Emphasis added.) Model Code of Professional Responsibility Canon 5 (1979).

In *Strickland v. Washington* (1984), 466 U.S. 668, 692, 80 L. Ed. 2d 674, 696, 104 S. Ct. 2052, 2067, the Supreme Court stated that its holding in *Cuyler v. Sullivan* (1980), 446 U.S. 335, 340-50, 64 L. Ed. 2d 333, 341-48, 100 S. Ct. 1708, 1713-19, was that prejudice is presumed when counsel is burdened by an actual conflict of interest from his joint representation of multiple defendants, that in those circumstances counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, the *Strickland* court concluded that it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests, and that given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts, it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interests.

From the totality of the circumstances in the case at bar, application of these foregoing legal and constitutional principles and directives to the defendants' attorney's dual, simultaneous representation of them, with their adverse, hostile, inconsistent conflicting interests

and concerns, and his patently incompetent performance before and during the defendants' joint trial, clearly establishes not only a presumption of prejudice, but indeed, positively and affirmatively establishes that the defendants were flagrantly denied their Federal and State constitutional rights to the effective assistance of counsel. The defendants are therefore entitled to a new trial, at which they are entitled to be represented by competent counsel.

## B

### THE DEFENDANTS' CONFLICTING INTERESTS
### AND
### THE DEFENDANTS' ATTORNEY'S INCOMPETENT PERFORMANCE

### I

### BECAUSE OF THE NATURE OF THE CHARGES, THE RELATIONSHIP OF THE DEFENDANTS TO EACH OTHER AND TO THE ALLEGED VICTIM, THE STATE'S INTRICATELY INTERWOVEN EVIDENCE AGAINST THE DEFENDANTS AND THE DEFENDANTS' CONFLICTING INTERESTS, IT WAS IMPOSSIBLE FOR ONE ATTORNEY TO COMPETENTLY AND LOYALLY REPRESENT BOTH DEFENDANTS AT THEIR JOINT TRIAL.

The defendants, Roy Williams and Emmaline Williams, were husband and wife. They were jointly charged with the commission of sex offenses upon their adopted minor daughter. Thus, an inherent ingredient of the instant case was the unique husband-wife relationship and confidentiality, and also at least the possibility of husband and wife privileged communications. An additional distinctive characteristic of the case was the parent-child relationship, all the attendant ramifications thereof, and, likewise, the possibility of parent-child privileged communications. *In re Ryan* (1984), 123 Misc. 2d 854, 474 N.Y.S.2d 931; *In re Agosto* (D. Nev. 1983), 553 F. Supp. 1298; *People v. Harrell* (1982), 87 A.D.2d 21, 450 N.Y.S.2d 501; *People v. Fitzgerald* (1979), 101 Misc. 2d 712, 422 N.Y.S.2d 309; *In re Application of A&M* (1978), 61 A.D.2d 426, 428, 403 N.Y.S.2d 375, 377; Annotation, *Testimonial Privilege For Confidential Communications Between Relatives Other Than Husband & Wife—State Cases*, 6 A.L.R.4th 544 (1981); Note, *Questioning the Recognition of a Parent-Child Testimonial Privilege*, 45 Alb. L. Rev. 142 (1980); *People v. Kirkman* (1988), 170 Ill. App. 3d 106, 112-25 (Pincham, J., dissenting).

The very nature of the alleged sex offenses by the defendants upon their adopted daughter should have indicated to counsel the conflict and the risks of his disloyalty and ineffectiveness in representing both defendants at their joint trial. Count I of the indictment alleged that the defendants, Roy Williams and Emmaline Williams, on or about April 1, 1984, in Cook County, Illinois, committed the offense of rape, in that they, of the age of 17 years and upwards, "had sexual intercourse with A.W., a child under the age of sixteen years." Count II alleged that said defendants on said date and at said place committed the offense of indecent liberties with a child, in that they, of the age of 17 years and upwards, "performed an act of sexual intercourse with A.W., a child under the age of 16 years." Count III charged that the defendants committed the offense of indecent liberties with a child, in that they, of the age of 17 years and upwards, "with the intent to arouse and satisfy their sexual desires, lewdly fondled and touched A.W., a child under the age of 16 years." Finally, count IV accused the defendants with committing the offense of unlawful restraint, in that they detained A.W. by holding her in a bedroom.

Thus, the defendants, Roy Williams and Emmaline Williams, were jointly charged in all four counts. They were husband and wife and obviously were known to be such by their attorney. The alleged victim in all four counts was A.W., the defendants' adopted daughter, and likewise was obviously known to be such by the defendants' attorney. Counts I, II and III jointly charged the defendants with the commission of sex offenses upon their adopted daughter, and count IV charged them with the commission of an offense upon her which was instrumental in the commission of the sex offenses alleged in counts I, II and III.

These sex accusations, in conjunction with the defendants' relationship to each other and to the alleged victim, should have forewarned counsel of the hazards of his joint representation of the husband and wife defendants, particularly where the alleged victim was their adopted minor daughter. Of course each defendant under the law was presumed innocent. That presumption does not control, however, in determining the proper alignment of defense counsel or the propriety of joint representation by a defense counsel in a multiple-defendant, multiple-count indictment. One defendant may in fact have committed the alleged offense, and the quantity and quality of the State's evidence against such defendant may vary from weak and meager to strong and overwhelming. Whereas, the other defendant may be in fact totally innocent and have absolutely no knowledge of the commission of the offenses. The glaringly apparent unique fea-

ture, on the facts, in the case at bar is that the defendants did not have but one defense available to them and that was that they did not commit the offenses. The defenses of mistaken identification, alibi and consent were realistically unavailable to them. Because of their restricted defense, the single attorney's dual representation of both defendants confronted him with the loyalty and conflict dilemmas in the confidential attorney-client communications and husband-wife confidential communication, as well as in his joint courtroom representation of them. Moreover, the relationship of the defendants to each other effectively inhibited possible plea negotiations by the single attorney on behalf of only one of the defendants. It would likewise appear that his joint representation of the husband-wife defendants could possibly warp their acceptance of his conflicting or synonymous advice to each of them on exercising their personal constitutional right to be tried by a jury. Defense counsel's cross-examination was curtailed and his fervor in the presentation of each defendant's defense was compromised by his dual representation of these defendants at their joint trial. In this unusual case, because of the charges, the only available defense thereto, the relationship of the defendants to each other and to the alleged victim and the unique facts upon which the State relied to prove the charges, the joint representation of the husband and wife defendants by the same attorney created counsel disloyalty and client conflicts. It was impossible for one attorney to competently represent both defendants at their joint trial, and the attorney's attempt to do so in the case at bar is indicative of his incompetency and selfishness. "Privately retained lawyers are subject to economic pressures and consequently cannot be relied on to alert clients to conflicts of interest." Lowenthal, *Joint Representation In Criminal Cases: A Critical Appraisal*, 64 Va. L. Rev. 939, 985 (1978).

## II

### PRETRIAL
### THE DEFENDANTS' COUNSEL SOUGHT NO PRETRIAL DISCOVERY.

The trial record shows that the defendants' counsel sought no pretrial discovery, to which he was entitled, under the provisions of Illinois Supreme Court Rule 412 (107 Ill. 2d R. 412). He was incompetent in not so doing. The record also clearly shows that he did not familiarize himself with and he did not properly utilize the pretrial discovery material which the State voluntarily furnished him. He was likewise incompetent in failing to do so. He did not file a pretrial motion for discovery. No such motion is contained in the record on ap-

peal. The trial clerk's memorandum of orders in the appeal record, commonly referred to as the halfsheet, does not reflect that the defendants' counsel filed a pretrial discovery motion or that an order was entered directing the State to furnish defendants' counsel with pretrial discovery.

## III

## A

### THE DEFENDANTS' ATTORNEY DID NOT MAKE A MERITORIOUS MOTION TO SUPPRESS DEFENDANT ROY WILLIAMS' STATEMENT.

The State contended that defendant, Roy Williams, gave a pretrial written, signed statement to Chicago police officer Lux and Assistant State's Attorney Jerry Walsh, in which he admitted and related his and codefendant Emmaline Williams' participation in the commission of the alleged offenses. Before trial, the State furnished defendants' attorney with a copy of defendant Roy Williams' statement, as pretrial discovery material. The defendants' attorney made no attempt to suppress this statement, although the trial testimony clearly established that there was a valid basis for making such a suppression motion. More importantly, on the basis of the record before us, the trial testimony also established that Roy Williams' statement should and would have been suppressed had a suppression motion been made. The defendants' attorney was incompetent in failing to make a motion to suppress defendant Roy Williams' statement.

The majority's assertion that "the questions of pretrial motions to suppress each accused's statements may well have been a question of trial strategy" (182 Ill. App. 3d at 602-03) is completely baseless. There is no valid trial strategy in not pursuing a meritorious motion to suppress a defendant's incriminating statement, and, if it was defendant's counsel's trial strategy not to do so, he was manifestly incompetent.

Additionally, the majority's following conjectures:

> (1) "[t]here is nothing in Officer Lux' trial testimony to suggest any basis to suppress the statements of defendant [Roy Williams]";

> (2) "the only question which could have been raised was the credibility of the witnesses";

> (3) "[c]ounsel may well have thought such motions would have been futile";

(4) "there was the possibility that had defendant [Roy Williams] *** testified in a pretrial setting something might have occurred that would have been used to impeach [him] at trial" (182 Ill. App. 3d at 603)

are not valid justifications for defendants' counsel's failure to have sought suppression of defendant Roy Williams' statement.

First, as the majority correctly speculates, there is always *the possibility that something might occur* during a defendant's pretrial testimony that could be used to impeach him at trial. Trial impeachment is always a *possibility* from a defendant's pretrial testimony. But, certainly, such a speculative possibility is not an acceptable reason for defendants' counsel's failure to have made a meritorious motion to suppress Roy Williams' statement.

Second, every defense counsel recognizes that a motion to suppress a defendant's inculpatory statement may be "futile." But the possible futility of the effort is no justification for not making the effort.

Third, frequently, again as the majority correctly speculates, on the hearing of a motion to suppress a defendant's statement "the only question which could have been raised was the credibility of the witnesses." (182 Ill. App. 3d at 603.) A determination of the credibility of the witnesses is nothing unique. Most assuredly, this can be no vindication for defendants' counsel's failure to have made the suppression motion.

Fourth, the majority's aforestated and accepted supposition for the defendants' attorney's failure to have attempted to suppress Roy Williams' statement is obviously premised on the majority's assumption that on the question of the credibility of the witnesses on an evidentiary hearing of the defendant's suppression motion, the trial court would automatically believe the officer and disbelieve the defendant. But, again, such an assumption, warranted or unwarranted, is not an acceptable reason for the defendants' attorney not to have sought suppression of Roy Williams' statement.

Fifth, the majority's assertion that "[t]here is nothing in Officer Lux' trial testimony to suggest any basis to suppress the statements of defendant [Roy Williams]" (182 Ill. App. 3d at 603) is no valid excuse for the defendants' attorney's neglect to have attempted to have the statement suppressed. Defense lawyers, prosecutors, and trial and appellate judges well realize that rarely, if ever, is there anything in a police officer's motion to suppress pretrial or trial testimony which "suggest[s] any basis to suppress the statements of [a] defendant." 182 Ill. App. 3d at 603.

Sixth, there is a significant absence in Officer Lux' trial testimony which clearly establishes the basis, indeed the absolute necessity, for suppressing Roy Williams' statement. The majority accurately states that defendant Roy Williams testified "that Officer Lux told him that codefendant [Emmaline Williams] made a written statement." (182 Ill. App. 3d at 600.) Although called as a rebuttal witness at trial, Officer Lux did not contradict or deny defendant Roy Williams' repeated trial testimony that Lux told him that his wife and codefendant, Emmaline Williams, had signed a written statement.

At trial, defendant Roy Williams testified on his own behalf, on direct examination:

"Q. Well, did they ask you to make a statement?

A. Yes. Officer Lux did.

Q. Before you made a statement what, if anything, did he say to you regarding the statement?

A. He said you got one strike on you. You a black man and when you go before the rich white judge from the suburbs you going up the road.

\* \* \*

*He said I got a signed statement from your wife* \*\*\* and your daughter. You might as well sign this because if you don't you going up the road and he says if you sign this you'll probably get a year's probation. Then after I signed this he says you understand I am not for you. I'm for A.[W.]" (Emphasis added.)

Defendant Roy Williams again testified on direct examination:

"Q. Well when he [Officer Lux] first talked to you what did he say?

A. *He told me, he says you better sign this. I got a signed statement from your wife,* your daughter A.W. and if you don't sign it you going up the road. He said now if you sign this you will get probation. He said because you got a strike on you being a black man the judge is not going to believe you. He's going to believe that child.

Q. Now what was said the second meeting between you and Officer Lux?

A. He repeated the same thing and then he had a paper." (Emphasis added.)

On cross-examination, the defendant, Roy Williams, for the third time testified:

"*He [Officer Lux] says I have a written statement. Signed statement from your wife,* your daughter and if you sign this you probably will get probation because he says the rich white

judge from the suburbs is not going to believe you.

* * *

Being a black man you got a strike on you if you go before a rich white judge from the suburbs. He wrote this up and told me to sign it." (Emphasis added.)

Twice on direct examination and a third time on cross-examination, defendant Roy Williams testified that Officer Lux told him that he had a written, signed statement from his wife. Significantly, when Officer Lux was called by the prosecutor as a rebuttal witness, he did not deny this statement the defendant attributed to him. Officer Lux was asked by the prosecutor and he testified on rebuttal:

"Q. Officer Lux *** when you spoke with Roy Williams did you tell him that if he signed a paper he would get probation?

A. No.

* * *

Q. Did you ever tell him that a white judge from the suburbs would not believe his story?

A. No."

It is apparent from the trial testimony of Officer Lux and the codefendant, Emmaline Williams, that Officer Lux did not have a written, signed statement from her, and that Officer Lux' contrary statements to the defendant Roy Williams were false. No such statement was established by the testimony of Officer Lux or the codefendant, Emmaline Williams, or from any other source. If such a written, signed statement by codefendant Emmaline Williams existed, it would be, but it is not, apparent from the record before us. It *is* clear, however, that based upon the foregoing segment of the record before us of Officer Lux' undenied representations to defendant Roy Williams that he had a written, signed statement from his wife, Emmaline Williams, the codefendant, there was a valid and meritorious basis for suppressing defendant Roy Williams' statement; certainly there was a basis for at least attempting to do so. *People v. Lee* (1984), 128 Ill. App. 3d 774, 780-81, 471 N.E.2d 567.

In *People v. Payton* (1984), 122 Ill. App. 3d 1030, 462 N.E.2d 543, the detective falsely told the defendant that he had been identified by the victim of a burglary and that his fingerprints had been found at the scene of the crime and the defendant admitted to the detective that he had committed the burglary. The defendant was convicted of the burglary. The appellate court reversed, holding:

"On appeal, defendant initially argues that the tactics used by Detective Strom were such as to render defendant's confession involuntary, and that the confession should have been sup-

pressed. We agree. In determining whether a confession was voluntarily made, it must be ascertained whether the defendant's will was overborne at the time he confessed or whether the confession was made freely, voluntarily and without compulsion or inducement of any sort. ***

*** It is undisputed that, prior to the time defendant made his confession, Detective Strom falsely told him that he had been identified by the victim of the crime, and that his fingerprints had been found at the scene. The United States Supreme Court has unequivocally stated that 'any evidence that the accused was threatened, tricked, or cajoled into a waiver [of the fifth amendment privilege against self-incrimination] will, of course, show that the defendant did not voluntarily waive his privilege.' (*Miranda v. Arizona* (1966), 384 U.S. 436, 476, 16 L. Ed. 2d 694, 725, 86 S. Ct. 1602, 1629.) Moreover, the Illinois Supreme Court has long recognized that confessions or admissions acquired by trick are inadmissible. (*People v. Stevens* (1957), 11 Ill. 2d 21, 27, 141 N.E.2d 33.) *** It seems apparent that a suspect grossly and intentionally misled as to the amount and strength of the evidence against him may well be induced to confess as a direct result of those misrepresentations. Defendant here testified that he was trying to 'cut himself a deal' by admitting his involvement in the crime, and we think it ignores reality to presume that neither the reliability nor the voluntariness of a confession is tainted by police conduct calculated to falsely persuade the defendant that his prospects for avoiding conviction are nearly hopeless. *** Finally, it matters not that defendant's confession here may have been true, for the truth or falsity of the confession is irrelevant insofar as the inquiry into its voluntariness is concerned. (*Jackson v. Denno* (1964), 378 U.S. 368, 377, 12 L. Ed. 2d 908, 915-16, 84 S. Ct. 1774, 1781.) Given the nature and extent of the trickery employed by Detective Strom, we conclude that the trial court's finding that defendant's confession was voluntary was contrary to the manifest weight of the evidence presented at the hearing on the motion to suppress." 122 Ill. App. 3d at 1033-34.

It is clear that defendant Roy Williams' counsel was incompetent in failing to make a motion to suppress his statement. *People v. Odom* (1966), 71 Ill. App. 2d 480, 218 N.E.2d 116.

On the state of the record in the case at bar as it appears before us, the statement of Roy Williams was obtained from him in violation of his fifth amendment right, which provides, "No person *** shall be

compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty or property, without due process of law ***" (U.S. Const. amend V) (made binding upon the States by the due process clause of the fourteenth amendment), and his similar rights under article I, sections 2 and 10, of the Illinois Constitution, which provide, respectively, "No person shall be deprived of life, liberty or property without due process of law ***" and "No person shall be compelled in a criminal case to give evidence against himself ***." (Ill. Const. 1970, art. I, §§2, 10.) The defendant Roy Williams' attorney's failure to invoke said constitutional rights by a motion to suppress his statement denied defendant Roy Williams his right to the effective assistance of counsel and to loyal counsel guaranteed him under the sixth amendment to the Constitution of the United States and article I, section 8, of the Constitution of the State of Illinois.

Defendant Roy Williams testified that the statement he signed was preprepared and predrafted by Officer Lux and Assistant State's Attorney Walsh, that Officer Lux, and not he, supplied the contents of the statement, and that he did not read the statement when Assistant State's Attorney Walsh presented it to him or before he signed it. Although this was denied by Officer Lux, it is significant that the State did not call Assistant State's Attorney Jerry Walsh, who Officer Lux stated took defendant Roy Williams' statement, as a witness during the trial, and the State did not offer any explanation for its failure to have done so. Even more significant, the defendants' counsel did not raise or rely on the State's failure to have called Walsh as a witness.

Officer Lux and the defendant Roy Williams both testified that the defendant did not write his statement, that the statement was written by Assistant State's Attorney Walsh and that the defendant thereafter signed it. Neither Officer Lux nor Assistant State's Attorney Walsh called a shorthand reporter to take the defendant's statement, and no explanation appears in the record for them not having done so.

A hearing on and a decision by the trial court on defendant Roy Williams' motion to suppress his statement would have placed the credibility of the defendant Roy Williams against the credibility of Officer Lux and Assistant State's Attorney Walsh for the trial court's determination. A ruling by the trial court favorable to the defendant Roy Williams on his motion to suppress his statement would have been an obvious indication that the trial court had concluded that the defendant was the more credible witness. Conversely, a denial of his motion to suppress his statement would have been a clear indication that the trial court had found that Assistant State's Attorney Walsh

and Officer Lux were the more credible witnesses. Based upon this pretrial assessment by the trial court of the credibility of defendant Roy Williams, Officer Lux and Assistant State's Attorney Walsh as witnesses, the defendants' attorney would have had a meaningful basis and barometer for advising the defendants on whether to exercise their constitutional right to be tried by a jury, determined by the trial court's ruling on the suppression motion. Advice by a defendant's attorney to waive a jury trial when the trial court has already rejected a defendant as a credible witness on the hearing of his motion to suppress his pretrial statement would ordinarily be incompetent advice, and particularly so on the facts in the instant case. (*People v. Chatman* (1967), 36 Ill. 2d 305, 223 N.E.2d 110.) The defendants' attorney's failure to have pursued and acquired this appropriate pretrial credibility determination by the trial court is another manifestation of the defendants' attorney's incompetence. No pretrial motion to suppress the defendant Roy Williams' statement was made, and, thus, there was no judicial determination of the constitutional validity on the voluntariness or the authenticity of the statement.

I momentarily leave, but will later return to, defendant Roy Williams' statement.

### B

It is noteworthy that codefendant Emmaline Williams at trial denied making any oral or written incriminating admission to Officer Lux. It would appear that had she made any voluntary incriminating admissions, they would have been reduced to writing. No reason appears for such admissions not having been reduced to writing, except perhaps, as she testified, such admissions were not made by her. But, here again, defendants' counsel did not raise the issue.

I am constrained to point out that the majority's statements— "The police then confronted codefendant [Emmaline Williams] with defendant's [Roy Williams'] statement. Codefendant told the officer that those events must have occurred if defendant said that they did" (182 Ill. App. 3d at 600)—are not totally correct and are indeed misleading. More accurately, Officer Lux equivocally and vacillatingly testified on direct examination:

"Q. What did you say to her at that time?

A. *** And then confronted her [Emmaline Williams] with what Roy had just told us.

Q. And what did she say to you at that time?

A. *I believe she said* that it must be so if he said it. If he said it's so. It's so. *Something to that effect*." (Emphasis added.)

The true evidentiary worth of this irresolute testimony of Officer Lux need not be assessed.

## IV

THE DEFENDANTS' COUNSEL MADE NO SEVERANCE MOTION
ON BEHALF OF CODEFENDANT EMMALINE WILLIAMS AND
HE THEREBY IGNORED AND DEFEATED HER BENEFICIAL
INTEREST IN AND TO A SEPARATE TRIAL.

The statement of defendant Roy Williams inculpated him and his wife, codefendant Emmaline Williams, in the commission of the alleged offenses. The pertinent portions of Roy Williams' written, signed statement follows:

"STATEMENT OF
ROY WILLIAMS
Taken June 17, 1985 at 4:30 AM
At Area 3VC 3900 S. California
* * *

This statement taken regarding the sexual intercourse with A.W. which occurred in April, 1984 at 6544 S. Damen at 11:30 PM.

* * *

My wife, Emma, asked me if I wanted to have sex with A.W. and I said I did—A.W. is my adopted daughter and she was 13 years old when this happened—Emma brought A.W. to our bedroom and told her to take her clothes off. I was already in bed without any clothes on. A.W. took her clothes off and got into bed with me—Emma took her clothes off and got into bed with us. When A.W. got in bed I touched her vagina and breasts. She was jumpy—Emma and I told her to relax. After she relaxed I got on top of her and put my penis in her vagina about a half inch. I was inside of her about ten minutes. She said her stomach hurt her so I stopped. I didn't reach a climax. After that we layed [sic] there awhile and Emma said she could go back to her bedroom. She left and went to her bedroom.

* * *

/S/ Roy Williams
ASA Jerry Walsh
Y.O. Frank McCall 6428
Y.O. J. Lux 8027"

Predicated on the State's intention to introduce defendant Roy Williams' statement as evidence against him on his trial, codefendant

Emmaline Williams was clearly entitled to a trial separate from his. (*People v. Schmitt* (1988), 173 Ill. App. 3d 66; *People v. McVay* (1981), 98 Ill. App. 3d 708, 715, 424 N.E.2d 922; *People v. Hernandez* (1988), 121 Ill. 2d 293; *People v. Cruz* (1988), 121 Ill. 2d 321.) Yet, the defendants' counsel did not familiarize himself with or utilize defendant Roy Williams' statement as a basis for a severance motion on behalf of codefendant Emmaline Williams. The defendants' counsel did not make a severance motion on behalf of codefendant Emmaline Williams. He was manifestly incompetent in failing to do so. He neglected to faithfully and loyally pursue and protect her interest in failing to do so.

Although the majority's statements, "a severance could be granted upon a showing of antagonistic defenses," and "the defenses in this case were not antagonistic" (182 Ill. App. 3d at 602), the accuracy of which is indeed questionable, the court's statements nevertheless are unquestionably incomplete and deceptive. Antagonistic defenses are not the sole basis for a severance. We recently stated in *People v. Schmitt* (1988), 173 Ill. App. 3d 66, 87:

> "We have repeatedly held that when a motion for a separate trial is predicated on the premise that a codefendant's confession or admission implicates the moving defendant, a severance should be granted unless the prosecution declares that the admission or confession will not be offered in evidence at the time of trial, or if offered, that there will be eliminated therefrom any and all references to the party applying for the severance."

Although *Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702, *Nelson v. O'Neil* (1971), 402 U.S. 622, 29 L. Ed. 2d 222, 91 S. Ct. 1723, *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, *People v. Jones* (1988), 121 Ill. 2d 21, *People v. Hernandez* (1988), 121 Ill. 2d 293, *People v. Cruz* (1988), 121 Ill. 2d 321, and *People v. Duncan* (1988), 124 Ill. 2d 400, involved whether a defendant's sixth amendment constitutional right of confrontation at a joint trial was violated by the State's use of a nontestifying codefendant's confession, these authorities are also instructive on a codefendant's right to a severance where the State intends to rely on a defendant's confession which implicates the codefendant in the commission of the offense for which they are jointly charged. The defendant's attorney did not protect codefendant Emmaline Williams' interest and right to a separate trial. Instead, the defendants' attorney improperly refused to utilize defendant Roy Williams' pretrial statement as a basis for making a severance motion on behalf of codefendant Emmaline Williams, and her beneficial interest in and right

to a separate trial went unenforced, unpursued and unprotected. As stated in *Nealy v. Carbana* (5th Cir. 1986), 782 F.2d 1362, 1365, quoting *Turnquest v. Wainwright* (5th Cir. 1981), 651 F.2d 331, 334, a defendant is "entitled to 'an attorney who [can] make a decision to use or not to use [testimony] unfettered by the effect of that decision on his other client's case.' "

In the supreme court's recent decision in *People v. Duncan* (1988), 124 Ill. 2d 400, Duncan and Olinger were tried for murder, armed robbery, armed violence and conspiracy. Duncan contended for reversal of his conviction that his trial should have been severed from Olinger's trial because of the admission of Olinger's statement at their joint trial, at which Olinger did not testify. Duncan complained, as does codefendant Emmaline Williams in the case at bar, that the "witnesses' testimony regarding alleged out-of-court statements by Olinger [Roy Williams], though properly inculpatory of Olinger [Roy Williams], had the effect of inculpating defendant [Emmaline Williams] as well *because the jury was likely to consider the testimony improperly against him.*" (Emphasis added.) (124 Ill. 2d at 403.) In *Duncan*, however, the trial court instructed the jury to consider Olinger's statement only in determining Olinger's guilt or innocence and not to consider Olinger's statement in determining Duncan's guilt or innocence. In the case at bar, however, the defendants' joint, incompetent attorney made no similar motion to the trial court to so restrict defendant Roy Williams' statement. Relying only in part on Olinger's failure to testify and Duncan's attendant inability to cross-examine him on the statement, the supreme court initially held in its first opinion, (1) that Olinger's statement was so inculpatory of Duncan, its admission at Duncan's trial "violated defendant's constitutional right of confrontation and (2) that fundamental fairness required a new trial." 124 Ill. 2d at 406.

Thereafter, *Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702,[1] was decided, and under authority thereof, the United States Supreme Court: (1) granted the People's petition for a writ of *certiorari* in *Duncan*; (2) vacated the judgment of the Illinois Supreme Court in *Duncan* reversing and remanding the cause for a new trial; and (3) remanded the cause to the Illinois Supreme Court for further consideration in light of *Richardson. Illinois v.*

---

[1]In *Richardson*, the Supreme Court held that a defendant's Federal constitutional right of confrontation was not violated by the use, at their joint trial, of a nontestifying codefendant's confession when the confession is redacted to eliminate references to the defendant and the jury is properly instructed not to use the confession against the defendant. 481 U.S. at 206, 95 L. Ed. 2d at 192, 107 S. Ct. at 1706.

*Duncan* (1987), 484 U.S. 806, 98 L. Ed. 2d 18, 108 S. Ct. 53.

On remand in *Duncan*, the supreme court of Illinois again held that admission of Olinger's statement was reversible error as to Duncan and reversed and remanded for a new trial, stating, "[T]he Illinois courts have long held that a choice must be made between severance, nonuse of a nontestifying codefendant's admissions, or redaction to eliminate all reference to the implicated defendant (*e.g., People v. Patris* (1935), 360 Ill. 596, 601)." *Duncan*, 124 Ill. 2d at 412.

The following language of the supreme court in *Duncan* is equally applicable to the facts and circumstances in the case at bar:

> "*The very fact that, given the interwoven nature of the prosecution's case,* it might be quite difficult adequately to impart proper limiting instructions *supports our view that the trial court erred in failing to sever defendant's trial from Olinger's.*" (Emphasis added.) 124 Ill. 2d at 411.

Given the interwoven nature of the defendants with each other and with the victim, and the nature of the prosecutor's case in the case at bar, it is obvious that the defendant's counsel erred and was incompetent in failing to present a severance motion on behalf of codefendant Emmaline Williams. To her detriment, he did not loyally pursue her rights and best interest.

Based on defendant Roy Williams' statement and the law applicable thereto, the defendants' attorney's failure to have sought a separate trial for codefendant Emmaline Williams was inexcusable and clearly denied codefendant Emmaline Williams her constitutional right to the effective assistance of counsel. He refused to protect or promote her best interest because of his improper joint, simultaneous representation of her husband.

## V

### A

ALTHOUGH INADMISSIBLE AGAINST HER, DEFENDANTS'
COUNSEL FAILED TO OBJECT ON BEHALF OF CODEFENDANT
EMMALINE WILLIAMS TO THE ADMISSION OF DEFENDANT
ROY WILLIAMS' STATEMENT AS EVIDENCE AGAINST HER.

Defendant Roy Williams' statement was inadmissible as evidence against the codefendant Emmaline Williams. Yet, their joint counsel failed to object on behalf of codefendant Emmaline Williams to its admission as to her. Nor did he move the trial court to restrict consideration of Roy Williams' statement only as to Roy Williams, and not to

consider it as evidence against Emmaline Williams. The defendants' counsel was disloyal to codefendant Emmaline Williams and was also incompetent in not so objecting and in not making such motions.

During the State's case in chief, Officer Lux testified on direct examination that People's exhibit No. 2 was defendant Roy Williams' signed statement given to Lux and Assistant State's Attorney Walsh, heretofore set forth herein. As previously pointed out, in said statement defendant Roy Williams implicated the codefendant, Emmaline Williams, with him in the commission of the alleged offenses and her name and her involvement in the offenses were not properly deleted from the statement. Their counsel made no such motion. Additionally, without any objection from defense counsel, not only was Roy Williams' statement admitted into evidence, but it was also published to the trial court during Lux' direct examination and before Lux was cross-examined by defendants' attorney:

"[ASSISTANT STATE'S ATTORNEY]: Judge, we would ask *** that this witness be allowed to publish this exhibit [People's exhibit No. 2].

THE COURT: Any objections to have it so published? What you're asking for is to have it admitted into evidence, identification marks to be stricken and that the witness publish it. Do you have any objection to that?

[DEFENSE COUNSEL]: *No objection.*

THE COURT: Accordingly, all identification marks to be stricken on People's Exhibit Number 2 *** and the State may publish said document through the witness. Proceed.

\* \* \*

Q. Officer *** would you at this time read that statement from the top to the end?" (Emphasis added.)

Thereupon, Officer Lux read to the trial court the complete statement of defendant Roy Williams, which included his inculpation of codefendant Emmaline Williams in the commission of the offenses (as the statement previously appears herein). Defense counsel's conduct was not trial strategy. It was obvious incompetence, because of which codefendant Emmaline Williams' interest was not only compromised and negated, but indeed her interest was ignored.

The only competent evidence against codefendant Emmaline Williams was the totally uncorroborated testimony of A.W., extremely belatedly given, under gravely suspicious circumstances. Emmaline denied commission of the offense. It was for the trial court to determine her innocence or guilt, influenced by and based solely on the admissible evidence against her, and uninfluenced by any improper or inad-

missible evidence. Under the circumstances of this case, if the trial court believed defendant Roy Williams' statement, which it obviously did, it became a physiological and mental impossibility for the trial court to have reached its determination of Emmaline's guilt completely uninfluenced by her husband's, the defendant Roy Williams', statement, in which he inculpates her in the commission of the offense and which was inadmissible against her. This is particularly so when the defendants' attorney did not request the trial court (1) to restrict its consideration of the statement to its maker, defendant Roy Williams, or (2) not to consider Roy's statement as evidence against codefendant Emmaline Williams; and more particularly so when the trial court gave absolutely no indication that it would or had so limited its reliance on Roy Williams' statement.

The majority, in mistaken reliance on *People v. Jones* (1988), 121 Ill. 2d 21, concludes that because "[c]odefendant [Emmaline Williams] testified and denied making any incriminating statement, and defendant [Roy Williams] claimed that his written admission was not intelligently made or true *** [t]here was no conflict of interest in the joint representation ***." (182 Ill. App. 3d at 602.) *Jones* does not consider a claim of a denial of a defendant's sixth amendment constitutional right to the effective assistance of counsel because of *incompetent counsel*.

I have previously noted herein the distinguishing characteristics of the relationship of the defendants to each other and to the alleged victim, the charges and the interwoven nature of the State's evidence in the case at bar, which need not be here reiterated. No such distinguishing characteristics were present in *Jones*. I hereafter discuss *Jones* in greater detail.

THE ADMISSION OF DEFENDANT ROY WILLIAMS'
STATEMENT AS EVIDENCE AGAINST THE CODEFENDANT
EMMALINE WILLIAMS VIOLATED THE LATTER'S
CONSTITUTIONAL RIGHT TO DUE PROCESS.

When the State brings a criminal charge against a single defendant or against multiple defendants, due process requires the State to prove, by only competent and admissible evidence, each defendant guilty beyond a reasonable doubt in order for such defendant to be found guilty. (*In re Winship* (1970), 397 U.S. 358, 25 L. Ed. 2d 368, 90 S. Ct. 1068.) The Supreme Court stated in *Jackson v. Virginia* (1979), 443 U.S. 307, 315, 317-18, 61 L. Ed. 2d 560, 571, 572-73, 99 S. Ct. 2781, 2787, 2788, "In *Winship*, the Court held for the first time that the Due Process Clause of the Fourteenth Amendment protects a

defendant in a criminal case against conviction 'except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged,' " and "under *Winship*, which established proof beyond a reasonable doubt as an essential of Fourteenth Amendment due process, it follows that when such conviction occurs in a state trial, it cannot constitutionally stand."

When the lines of the trial battle are drawn, when the die of the trial conflict is cast, when the attack is launched, it is the State against the defendant or defendants. The defendant is called upon and required to defend against and meet only the State's valid evidence and the testimony of witnesses the State calls to testify against him. The trial is the State against the defendant. The trial is not a contest by the State and a codefendant on trial against a defendant also on trial. A defendant is not required to, he should not be required to, and indeed due process prohibits him from being required to meet and defend against evidence and testimony presented by the State and simultaneously defend against evidence and testimony presented by his codefendant. A defendant's counsel's cross-examination of a codefendant may satisfy the defendant's constitutional right to confrontation and cross-examination, but it falls far short, indeed it utterly fails in my judgment, to comply with the due process prohibition against a defendant being required to defend against a codefendant's trial testimony or against a codefendant's pretrial statement admitted into evidence that inculpates the defendant in the commission of the charged offense. This is precisely what happened in the case at bar.

Defendant Roy Williams' pretrial statement, inculpating codefendant Emmaline Williams in the commission of the charged offenses was admitted into evidence. The prosecutor urged the trial court to rely on defendant Roy Williams' pretrial statement in finding both defendants guilty, and it is quite apparent from the record that the trial court did so. This was fundamentally unfair and denied codefendant Emmaline Williams constitutional due process.

A codefendant cannot dictate to a defendant to testify, not to testify, or what the defendant's testimony will be should the defendant elect to testify. There is not the slightest suggestion in the case at bar that codefendant Emmaline Williams in any way influenced defendant Roy Williams to testify or in what his testimony should be, and vice versa. Moreover, there is likewise no evidence that either of them directed the contents of either of their alleged pretrial statements. Yet, it is clear that codefendant Emmaline Williams was convicted on defendant Roy Williams' pretrial statement, which was certainly inadmissible against and nonbinding upon her. She was required to simul-

taneously defend against the dual evidence of the State and her codefendant-husband, in violation of constitutional due process.

It really was no meaningful or satisfactory vindication or solution to codefendant Emmaline Williams' due process violation, caused by the admission of defendant Roy Williams' statement into evidence against her, that the defendants' joint counsel could have cross-examined defendant Roy Williams when he testified, pursuant to codefendant Emmaline Williams' sixth amendment right of confrontation. First, *Richardson v. Marsh* (1987), 481 U.S. 200, 95 L. Ed. 2d 176, 107 S. Ct. 1702, *Nelson v. O'Neil* (1971), 402 U.S. 622, 29 L. Ed. 2d 222, 91 S. Ct. 1723, *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620, *People v. Jones* (1988), 121 Ill. 2d 21, *People v. Hernandez* (1988), 121 Ill. 2d 293, *People v. Cruz* (1988), 121 Ill. 2d 321, and *People v. Duncan* (1988), 124 Ill. 2d 400, do not address this due process claim.

Second, defendants' joint counsel's cross-examination of defendant Roy Williams on behalf of codefendant Emmaline Williams on his statement only would have aggravated the imbroglio. Their joint counsel called defendant Roy Williams as a witness on his behalf, not on behalf of codefendant Emmaline Williams. Defendant Roy Williams testified on direct examination. He was then cross-examined by the prosecutor. He stated in essence that he was persuaded by Officer Lux and Assistant State's Attorney Walsh to sign the statement and that its contents were not true. For the defendants' counsel to thereafter cross-examine defendant Roy Williams under and on these circumstances would indeed be compromising and would assuredly adversely impact on the integrity and persuasiveness on his subsequent argument to the trial court to accept and rely on codefendant Roy Williams' credibility as a witness and acquit him. His disloyal role of cross-examining his own client, defendant Roy Williams, on behalf of his client, the codefendant Emmaline Williams, would have compromised his dedication to Roy. His failure to cross-examine him violated his loyalty to Emmaline.

Third, the right, the ability and even the actual cross-examination of a defendant, on behalf of a codefendant, on a defendant's pretrial statement or confession in which he inculpates the codefendant in the commission of the alleged offense and which is repudiated by the defendant at trial do not cancel the statement or confession's incriminations of the codefendant when admitted into evidence, even though the statement or confession is inadmissible against the codefendant. The result is that the State has used a defendant's prejudicial, inadmissible hearsay pretrial statement or confession as evidence to con-

vict a codefendant, in violation of constitutional due process. This was more egregiously so in the case at bar because there was no pretrial determination of the constitutional validity of defendant Roy Williams' statement, because the defendants' joint attorney neglected to make an appropriate motion to suppress it.

## VI

### A

#### THE DEFENDANTS' ATTORNEY NEGLECTED TO FAMILIARIZE HIMSELF WITH AND TO PROPERLY UTILIZE OTHER PRETRIAL DISCOVERY MATERIAL VOLUNTARILY FURNISHED HIM BY THE STATE.

The Supreme Court of the United States observed in *Wheat v. United States* (1988), 486 U.S. 153, 163, 100 L. Ed. 2d 140, 151, 108 S. Ct. 1692, 1699, that "[a] few bits of unforeseen testimony or a single previously *unknown or unnoticed document* may significantly shift the relationship between the multiple defendants." (Emphasis added.) This is precisely what happened, or rather is precisely what should have happened, and properly would have happened but for the incompetence of the defendants' attorney.

The defendants' attorney did not familiarize himself with the adopted minor daughter-victim's handwritten, seven-page recording, purportedly of the defendants' commission of the offenses, voluntarily furnished the defendants' attorney by the State as pretrial discovery material. This written statement of the alleged victim is set forth in full as an appendix hereto. In this written statement, the alleged victim inculpated both defendant Roy Williams and codefendant Emmaline Williams in the commission of the alleged sex offenses upon her. Trial proceeding colloquy affirmatively establishes that, not only did the defendants' counsel fail to familiarize himself with the contents of the alleged victim's said statement, but more importantly, said colloquy, during the midst of the trial, establishes outrightly that the defendants' attorney did not even know that he had been furnished the alleged victim's statement or that he had it in his possession.

After testifying on direct examination to the defendants' commission of the sex offenses upon her, the prosecutor then asked the alleged victim, she testified, and the following colloquy occurred:

"Q. Now by the way, shortly after the incident did you have occasion to write a letter to anyone concerning this incident?

A. Yes.

Q. How long after the first incident, the one in early April of 1984 did you write this letter?

A. A couple of weeks after that.

Q. And who did you write this letter to?

A. Mrs. Abernathy.

Q. Who was Mrs. Abernathy to you at that time?

A. She was my former foster mother.

MR. DURKIN: Your Honor, at this time I ask leave of court to mark as People's Group Exhibit Number 1, four pages with writing on both sides, handwritten statement.

THE COURT: [Defense Counsel], do you have any objection to having it marked for identification purposes only?

[DEFENSE COUNSEL]: I object, Judge. *The State never furnished us with a copy. This is the first time I've ever heard of it or seen it.*

MR. DURKIN: My records indicate all the D.C.F.S. [Department of Children and Family Services] records were tendered back in May of '86.

[DEFENSE COUNSEL]: *We never received this.* Although discovery was completed.

MR. DURKIN: I don't know, Judge. *Our records indicate otherwise. All these documents were tendered over to the defense.*

[DEFENSE COUNSEL]: *Nothing of that kind has ever come to me.*

MR. DURKIN: We've got the copies. We made copies of D.C.F.S. reports. *Counsel's file is a good size. I have a feeling they're in there.*

THE COURT: Do you have your files in there?

[DEFENSE COUNSEL]: I have my file.

THE COURT: *Would you allow the State's attorney to see whether that was included in the file you have before you?*

MR. DURKIN: *Here we go, Judge. He's got it.*

THE COURT: Let the record show that the documents that were submitted by defense counsel to the state's attorney were examined by *the state's attorney,* and he *indicated to this court that he found this document which [defense counsel] indicated he had never—Never had been given to him prior to time of the trial of this case. Accordingly, I believe the State has complied with all discovery, and your objections are overruled.*

[DEFENSE COUNSEL]: *I apologize, Judge.*

\* \* \*

By MR. DURKIN:

Q. I'm going to show you the exhibit, A.W., that's been marked as People's Group Exhibit Number 1. Would you take a look through that exhibit, each page, please. Do you recognize the People's Group Exhibit Number 1?

A. Yes.

Q. A.W., what do you recognize this to be? What is this? The exhibit I just showed you?

* * *

A. The sexual abuse that happened to me in April of 1984.

THE COURT: I understand that, but that is a letter, is that right?

A. Yes.

THE COURT: *** Did you write the letter?

A. Yes.

THE COURT: Who did you write it to?

A. Mrs. Abernathy.

THE COURT: Mrs. Abernathy?

A. Yes." (Emphasis added.)

It is obvious from the foregoing that the defendants' counsel had not familiarized himself with the alleged victim's statement. He was totally unaware that it was in his possession. It is irrefutably apparent that the defendants' attorney before trial could not possibly have reviewed and analyzed the victim's statement and formulated the best trial strategy and most feasible and beneficial tactics to pursue regarding it and its contents for its minimum detriment to the defendants.

The preceding colloquy between the trial court and counsel, and A.W.'s direct testimony regarding her letter to Mrs. Abernathy about "the sexual abuse that happened to me in April of 1984," concludes at page 33 of the trial transcript. Assistant State's Attorney Durkin thereafter further questioned A.W. on direct examination for only five additional pages of the transcript. A.W. was then tendered to the defendants' attorney for cross-examination. The defendants' attorney did not ask for a recess to read and familiarize himself with A.W.'s statement, which he only moments previously discovered, for the first time, he had in his possession. Instead, upon conclusion of A.W.'s direct examination, surprisingly, the defendants' attorney proceeded immediately to cross-examine her. Defendants' counsel's cross-examination of A.W. consists of a grand total of 10 pages. He did not ask A.W. a single question on cross-examination about the contents of or on what she wrote of the incident in her statement. Yet, even a hasty

reading of her statement discloses many significant contradictions, inconsistencies and omissions between what A.W. testified on the witness stand occurred and what A.W. wrote in her statement occurred. I note but a few of these contradictions and omissions.

A.W. testified on direct examination:

"Q. When did your clothes come off after you went to the bedroom?

A. When she [codefendant Emmaline] was holding the doorknob *she made me take 'em off.*" (Emphasis added.)

Subsequently, A.W. conversely testified on direct examination:

"Q. How did she make you take your clothes off?

A. Because *she took them off with her hands* while she was holding the doorknob. *She took them off* with the other hand." (Emphasis added.)

A.W. never stated in her statement, People's exhibit No. 1, that codefendant Emmaline took off her clothes.

Next, A.W. testified on direct examination:

"Q. What were her words to you—her exact words to you?

A. She said that mama loves you and that *the reason why she haven't been doing it* because she got hurt trying to put the air conditioner into the window and *she couldn't do it—do anything with him. That's why she had been asking me to do it.*

Q. Because she had hurt herself?

A. Yes." (Emphasis added.)

Although it is not unequivocally clear from her testimony that A.W.'s above statement referred to the alleged April 1984 sex acts for which the defendants were charged and on trial, it is evident from the prosecutor's following closing argument that he contended that this testimony related to the alleged April 1984 sex offenses for which the defendants were charged and on trial. The prosecutor initially argued in closing argument:

"The evidence has shown through her that the mother or adopted mother, Emmaline Williams, did tell her she had a favor for her to do. In fact *she told her that she couldn't have sex with her husband because she had a bad back.*" (Emphasis added.)

The prosecutor subsequently stated to the trial court in closing argument:

"She [A.W.] tells you defendant Roy Williams admits that his wife had back problems and she tells you who she [codefendant Emmaline] told [A.W.] that that was one of the reasons that she was having her [A.W.] have sex with her husband rather

than herself."

In imposing sentence, the trial court relied on A.W.'s testimony that the defendants told her that codefendant Emmaline could not have sexual relations with defendant Roy Williams because of some physical infirmity as a reason for the defendants' sexual involvement with A.W. The trial court stated in imposing sentence:

"There's no need for that kind of nonsense. *I know your wife was in a physical condition where she could not satisfy you. That was brought out in the trial of the case.*" (Emphasis added.)

There is not one word in A.W.'s written statement, People's exhibit No. 1, about codefendant Emmaline Williams' physical condition or her physical condition's impact on her sexual powers. A.W. does not attribute in her statement any remark to either defendant about Emmaline's physical condition or her lack of sexual abilities as a reason, or otherwise, for codefendant Emmaline's request for A.W. to have sexual intercourse with her husband, defendant Roy Williams. Of far greater significance, and diametrically contrary to her foregoing trial testimony, A.W. stated in her statement that the codefendant Emmaline Williams and the defendant Roy Williams *did* have sexual intercourse that night. A.W. contradictorily stated in her statement:

"*Then she said A.W. you not doing it right. Then she made me move over. While him and her did it. Then they stop* \*\*\*." (Emphasis added.)

There was no cross-examination of A.W. by defendants' counsel on these glaring and vital contradictions with and omission from A.W.'s trial testimony.

In the context in which A.W. testified and wrote in her statement, there can be no question that A.W. meant sexual intercourse when she used, and when she attributed to codefendant Emmaline Williams the use of the terms:

"*the reason why she haven't been doing it*";
"*she couldn't do it*";
"*do anything with him*";
"*that's why she had been asking me to do it*";
"*you not doing it right*";
"*while him and her did it.*" (Emphasis added.)

The prosecuting attorneys and the trial court construed and accepted A.W.'s aforesaid terminology as meaning sexual intercourse. Any other construction would have been totally illogical. Meaning sexual intercourse, or whatever else A.W. might have meant by the foregoing expressions, A.W. testified at trial that codefendant Emmaline

Williams told her that she couldn't *"do it"* with her husband because of some physical infirmity and for that reason Emmaline requested A.W. to *"do it"* with her husband, defendant Roy Williams, and that she did so. This trial testimony of A.W. is directly contradicted by A.W.'s written statement, which she testified was prepared by her two weeks after the incident was supposed to have occurred. In A.W.'s written statement she stated that codefendant Emmaline told her, *"A.W. you not doing it right,"* and that codefendant Emmaline made her move over, *"while him and her did it."* (Emphasis added.) If *"him and her did it,"* as A.W. stated in her statement, then codefendant Emmaline could not have told A.W. that she could not *"do it"* because of an injury and therefore wanted A.W. *"to do it"* with her husband, defendant Roy Williams, as A.W. testified, in direct contradiction to her statement. (Emphasis added.) The defendants' attorney neglected to, indeed the record discloses that he did not know to, cross-examine A.W. on these extremely pertinent contradictions between her statement and her trial testimony. He was incompetent.

Next, A.W. testified, on six different occasions, at trial that after the defendants committed the sex acts on her in April 1984, she immediately told the defendants' 19-year-old daughter, Tanya Bergen, what the defendants had just done to her. A.W. testified on direct examination:

> "Q. What's the next thing that happened?
> A. I went to \*\*\*. I knocked on Tanya's door and told her to come in the bathroom and I told her what happened and she didn't believe me."

A.W. similarly testified later on direct examination:

> "After you told Tanya what happened what's the next thing you did?
> A. I went to bed."

A.W. further testified, on direct examination, when she got up that morning:

> "Q. And when you got up what happened?
> A. \*\*\* [T]anya came upstairs and asked me what happened again and I told her again."

A.W. additionally testified on direct examination about that afternoon:

> "Q. When did you next see Tanya?
> A. When I came from school.
> Q. And what happened when you saw Tanya?
> A. \*\*\* [S]he just kept saying that she couldn't believe that had happened."

A.W. again testified on cross examination:

"Q. Did you ever tell any of them about it?

A. I told her daughter the night it happened."

A.W. later, again, testified on cross-examination:

"Q. Did you discuss this incident with anyone excepting the person on the hot line?

A. I told her daughter.

Q. *** [W]hen did you tell her daughter about it?

A. The night it happened.

THE COURT: How old is the daughter?

* * *

A. Nineteen."

Although, as set forth, A.W. six times repeatedly testified that she told Tanya what she contended the defendants had done to her, she never once mentioned in her written statement, People's exhibit No. 1, purportedly prepared by her shortly after the incident, that she had told Tanya about it. Defendants' counsel was incompetent in not cross-examining A.W. on these numerous contradictions and omissions between her statement and her trial testimony. *People v. Jackson* (1968), 96 Ill. App. 2d 99, 238 N.E.2d 234.

The prosecutor did not allow the trial court to overlook A.W.'s testimony that she promptly told Tanya Bergen what the defendants had done to her. In his initial opening argument urging the trial court to find the defendants guilty, the prosecutor stated:

"She told you how there was prompt outcry made to Tanya Bergen, another daughter of the defendants."

Although, from A.W.'s statement, there was an extremely adequate and valid basis for defendants' counsel to successfully challenge the integrity and veracity of this vital aspect of the State's case, he failed to do so. The defendants' counsel was incompetent.

## B

Defendants' counsel was incompetent in not calling Tanya Bergen as a defense witness. As previously set forth herein, A.W. testified on six occasions that immediately after the occurrences she told Tanya Bergen that the defendants had committed the sex acts upon her. A.W. did not state in her written statement, however, that she related this to Tanya. The prosecutor subpoenaed Tanya Bergen as a witness but he did not call her as a witness, apparently because she did not verify, but instead contradicted, that A.W. had told her that the defendants committed the sex acts upon her. Tanya Bergen was therefore a favorable witness to the defendants to refute A.W.'s 14-month belated assertion that A.W. told her about the defendants' misdeeds

14 months earlier, when it supposedly happened, or at any other time.

The trial commenced and A.W. testified on November 19, 1986. The trial was continued to December 4, 1986. When the trial resumed on that date, the defendants' attorney answered that he was ready and thereupon the following colloquy occurred:

"THE COURT: *** [T]he state have you any witnesses to call?

[ASSISTANT STATE'S ATTORNEY]: Judge, we do. We have a police officer [Lux]. We also want to put on the record that *one of the witnesses we had subpoenaed, this Tanya Bergen, is in court today, but after speaking to her it is our election not to call her as a witness.* I don't know if defense wants her.

THE COURT: *Do you want to call her?*

[DEFENDANTS' ATTORNEY]: *No, sir.*

THE COURT: *You have no need for her?*

[DEFENDANTS' ATTORNEY]: *No, sir.*" (Emphasis added.)

The prosecutor stated that after speaking to Tanya Bergen, it was his election not to call her as a witness. The defendants' attorney before us convincingly argues that had Tanya Bergen confirmed to the prosecutor that A.W. told her of the defendants' commission of the sex acts upon her, the prosecutor would have called her as a witness to corroborate A.W.'s trial testimony that she had done so. Conversely, the defendants' attorney just as convincingly argues that it is obvious that the prosecutor did not call Bergen as a witness because Bergen disputed and denied to him A.W.'s assertion that A.W. had done so. Thus, the defendants' attorney further argues before us, with equal persuasion, that Bergen was a favorable witness for the defendants to refute A.W.'s extremely untimely and belated trial assertion that she had told Bergen what the defendants had done to her. Contrary to the defendants' trial attorney's response to the trial court's inquiries that he had no need for and did not want to call Tanya Bergen as a witness, the defendants' trial attorney *did* have a need for and should have called Tanya Bergen as a defense witness. He was incompetent in failing to do so.

The supreme court recently held in *People v. Caballero* (1989), 126 Ill. 2d 248, 277, that a post-conviction petition which alleged that defense counsel did not call three named persons as mitigating witnesses on the defendant's death sentencing hearing simply because they were not unalterably opposed to the death penalty "raise[d] a serious question as to counsel's competence." The supreme court reversed the trial court's order which dismissed the petition and re-

manded the cause to the trial court "for an evidentiary hearing on that portion of defendant's petition which alleges that he was denied a fair sentencing hearing by counsel's alleged failure to present certain witnesses in mitigation." (126 Ill. 2d at 283.) The supreme court expressly emphasized that the question to be determined by the trial court upon remand was "whether the defendant was afforded the effective assistance of counsel" (126 Ill. 2d at 282) by defense counsel's failure to call the three mitigating witnesses at the sentencing hearing.

## VII

### ALTHOUGH THE ALLEGED VICTIM'S, A.W.'S, LETTER WAS CLEARLY INADMISSIBLE, PREJUDICIAL HEARSAY EVIDENCE, DEFENDANTS' COUNSEL NEVER OBJECTED TO ITS ADMISSION.

A.W. testified that she wrote People's exhibit No. 1, a letter to Mrs. Abernathy, her former foster mother, in which she set forth the defendants' commission in April 1984 of the sex acts upon her and to which she testified, a couple of weeks after the occurrence. She never delivered the letter to Mrs. Abernathy and no explanation was offered for her not having done so. According to A.W., she kept the letter secreted in her dresser drawer for over 14 months, and in June 1985, she turned the letter over to Officer Lux during his investigation in the instant case. The letter was classic prejudicial inadmissible hearsay.

Hearsay is an out-of-court oral or written declaration offered or relied on in court to prove the truth of the matter asserted therein. Oral or written declarations are hearsay when the declaration (1) was made out of court; (2) is offered to prove the truth of the matter asserted therein; and (3) the veracity of the declaration rests upon the credibility of the out-of-court declarant. *People v. Hunter* (1984), 124 Ill. App. 3d 516, 528, 464 N.E.2d 659; *People v. Jones* (1983), 114 Ill. App. 3d 576, 589, 449 N.E.2d 547; *People v. Clark* (1982), 108 Ill. App. 3d 1071, 1079-81, 440 N.E.2d 387.

A.W.'s trial testimony that she wrote the letter two weeks after the incident and kept it for 14 months in her dresser drawer was uncorroborated. It is certain that A.W.'s letter was offered by the prosecution and admitted as evidence to corroborate A.W.'s trial testimony. This tactic has been described as an attempt to lift a witness by his own bootstraps. A.W.'s letter was hearsay in its purest form and was inadmissible as evidence against the defendants. *People v. Fuelner*

(1982), 104 Ill. App. 3d 340, 349-52, 432 N.E.2d 986.

In *People v. Clark* (1972), 52 Ill. 2d 374, 389, the supreme court held:

> "[A] witness may not testify as to statements he made out of court for the purpose of corroborating his testimony given at the trial relative to the same subject."

In *People v. Rogers* (1980), 81 Ill. 2d 571, 577, 578, the supreme court stated:

> "It appears that no single facet of the law has been productive of as much confusion as has the application of the hearsay evidence rule. *** The definition of hearsay itself is deceptively simple and is generally accepted to be testimony of an out-of-court statement offered to establish the truth of the matter asserted therein, and resting for its value upon the credibility of the out-of-court asserter. ***
>
> In *People v. Clark* (1972), 52 Ill. 2d 374, 388-90, this court noted the general rule that although the witness may be present in court and subject to cross-examination, *he may not testify as to statements he made out of court for the purpose of corroborating his testimony given at trial relative to the same subject ***.*" (Emphasis added.)

In spite of its obvious inadmissibility, the defendants' attorney did not voice any objection to the admission into evidence of A.W.'s prejudicial inadmissible hearsay statement. His failure to object was not an oversight. It is apparent that he did not know to object. (*People v. De-Simone* (1956), 9 Ill. 2d 522.) He was incompetent.

> "MR. DURKIN: [assistant State's Attorney]: Judge, at this time *** we would ask that the identification marks from People's Exhibit Number 1, for identification *** we would ask that it be admitted into evidence and the identification marks be stricken.
>
> THE COURT: Any objections, Mr. [Defense Attorney]?
>
> [DEFENSE ATTORNEY]: *No objection.*
>
> THE COURT: Accordingly, it will be *** admitted into evidence." (Emphasis added.)

The majority in the case at bar accurately observes, "The case was quite simple and direct. The case involved complainant's testimony and Officer Lux' testimony about codefendant's [Emmaline's] oral statements and defendant's [Roy's] oral and written statements as opposed to the denials of defendant and codefendant at trial ***." (182 Ill. App. 3d at 603.) The majority immediately thereafter, however, conversely and fallaciously concludes:

"This letter [People's exhibit No. 1] was merely cumulative in nature to complainant's testimony. *** Thus, even if the admission of the letter can be questioned, defendant and codefendant cannot claim prejudice." 182 Ill. App. 3d at 603.

This erroneous conclusion by the majority, that the defendants were not prejudiced by the admission of A.W.'s letter, simply ignores the record. The record discloses that the prosecutor adamantly urged the trial judge to rely on A.W.'s inadmissible hearsay letter as evidence of the defendants' guilt. The record likewise discloses that the trial court accepted the prosecutor's urging and relied on A.W.'s inadmissible hearsay letter in determining the defendants' guilt.

In his opening argument to the trial court, the prosecutor argued:

"Further Your Honor, she told you how shortly after the incident she wrote a letter and that would be People's Group Exhibit 1 which she said she was going to deliver to Mrs. Abernathy. I would ask leave of court to approach the court with that so the court may have that.

THE COURT: You may do so.

[ASSISTANT STATE'S ATTORNEY]: I would also give the court People's Exhibit 2, which is in evidence.

THE COURT: Thank you.

[ASSISTANT STATE'S ATTORNEY]: Your Honor, she told you how she wrote that letter and the court can inspect it. It's a long letter and that she was going to deliver it to Edna Abernathy, her previous foster mother, but then Emmaline Williams had made threats to her about what happened if she told the police. *** Your Honor based upon the facts of the case and the evidence you heard we would ask that you find each defendant guilty of each charge in this indictment."

In the defendants' counsel's short three-page closing argument, he commented on the letter, adversely to the defendants' interest, as follows, a further manifestation of his incompetence:

"Exhibit 1 is undated except for April of 1984. *That's the exhibit which she wrote to someone about these things that had happened.*" (Emphasis added.)

In the prosecutor's concise 1⅛-page final closing argument, the prosecutor devoted over one-half of it to the letter. He expounded:

"And lastly Judge, *I think that great emphasis should be put on the letter that was written.* Not fourteen months after the incident, but right after it happened *where she memorializes* the clothing that she was wearing, *what actually went down,* about the radio and changing the radio station. *Everything is*

*contained in that letter* so she wouldn't forget or not that she needed a letter to remind her of the horror that she went through in April of 1984. Judge, I think the evidence is clear. It's convincing and the defendants in fact are guilty of the charges of rape and indecent liberties. Thank you." (Emphasis added.)

Immediately upon the conclusion of the prosecutor's aforesaid final closing argument, the trial court recessed to read the letter. The trial court stated:

"Five minutes recess, gentlemen. *I'm going to read the letter.* Five minutes." (Emphasis added.)

The trial judge left the bench and there was a recess. When the trial judge returned to the bench, after having read and relied on the letter during the recess, he promptly found both defendants guilty.

Subsequently, on the hearing of the defendants' motion for a new trial, A.W.'s prejudicial inadmissible hearsay letter again surfaced. Their attorney then argued to the trial court:

"Now fourteen months after April of 1984, there is a letter written by the alleged victim stating that certain things happened to her in April of 1984, things done to her by both defendants."

The defendants' attorney repeated to the trial court in his argument for a new trial.

"We had the complaining witness who made a statement."

The trial court denied the defendant's motion for a new trial.

Based on the foregoing, it cannot be seriously or convincingly contended that the prosecutor did not urge the trial court to consider and rely on A.W.'s inadmissible hearsay letter. More importantly, from the foregoing it is positively certain that the trial court relied on the prejudicial inadmissible hearsay letter in finding the defendants guilty. The majority's contrary conclusion is not only grossly inaccurate, it clearly contradicts the record. Of even greater significance, however, are: (1) A.W.'s testimony about the inadmissible hearsay letter and its admission into evidence without objection from the defendants' counsel; (2) defendants' counsel's unawareness that the letter had been furnished him during pretrial discovery; (3) defendants' counsel's failure to familiarize himself with the letter's contents; (4) no cross-examination by defendants' counsel of A.W. on the letter; (5) defendants' counsel's failure to object to the prosecutor's closing arguments on the letter; and (6) the trial court's reliance on the letter in finding the defendants guilty, all of which positively establish the defendants' counsel's absolute incompetence. His errors were not trial tactics or

strategy, or even misapprehensions of the law. It is apparent that he did not know the law fundamental to the basic issues in this case. *People v. Wright* (1986), 111 Ill. 2d 18.

## VIII

### A

THE DEFENDANTS' ATTORNEY FAILED TO
PRESENT FAVORABLE EVIDENCE ON BEHALF
OF THE DEFENDANTS.

I have previously expressed my agreement with the majority's assessment that, "The case was quite simple and direct. The case involved complainant's testimony and Officer Lux' testimony *** as opposed to the denials of defendant and codefendant at trial ***." (182 Ill. App. 3d at 603.) The defendants' attorney incompetently neglected to present to the trial court favorable evidence on behalf of the defendants which could have persuaded the trial court to resolve the credibility issue favorably to the defendants.

After the trial court found the defendants guilty and before sentencing, each defendant retained additional counsel, who presented evidence of A.W. and the defendants' characters and credibility on the defendants' sentencing hearing. This evidence was more appropriately presentable on behalf of the defendants on their trial.

A.W. claimed that on the day after the defendants had sex with her in April 1984, she was suspended from school for fighting. For 14 months thereafter, she made no mention of the defendants' sexual attack upon her, except, according to her, to 19-year-old Tanya Bergen. In June 1985, 14 months after the defendants' alleged sex attack upon her, A.W. was again suspended from school for fighting. Additionally, A.W. admitted that on this day of her suspension from school for fighting she improperly mopped the kitchen floor at her home, for which codefendant Emmaline Williams punished her and she ran away. Codefendant Emmaline Williams testified that she refused 13-year-old A.W.'s repeated requests to promiscuously go out with boys and that she would not allow A.W. to stay out after reasonable hours.

A.W. went to a former foster mother's residence and claimed to her, for the first time, that the defendants had committed the sex acts upon her 14 months previously.

At trial, A.W.'s credibility was not only *an* issue, A.W.'s credibility was *the* issue. Although invaluable evidence adversely affecting A.W.'s credibility was available at trial, the defendants' attorney did

not present it. He was incompetent in failing to have done so.

At the defendants' sentencing hearing on December 30, 1985, the defendants' post-trial retained attorneys presented two letters from A.W.'s grammar school teachers, both of which stated that A.W. was not worthy of belief. The defendants contend that these unbiased public servants, guardians of our youth, were in a far superior, exposed and unrestricted position to evaluate A.W.'s credibility than the limited, restricted trial atmosphere of the trial judge. One letter stated:

"To Whom It May Concern:

I was [A.W.'s] seventh grade teacher at O'Toole Elementary School. I am not a practicing psychologist. During parental conferences, I attempted to express my concern over the character development of [A.W.]. On numerous occasions, I found her to become an inveterate liar. It appeared to me that she was having a difficult time dealing with reality. This personality deficit was so severe that in layman's terms she would in a second become Dr. Jekyll and Mr. Hyde. These severe swings sincerely caused personal consternation. Her thwarted attempts to manipulate resulted in behavior difficult for me to describe.

\* \* \*

[A.W.] is in need of pre-adolescent psychological counseling.

Respectfully submitted,

/S/ Mrs. Arline D. Chatman"

The other letter similarly stated:

"December 18, 1986

To Whom It May Concern:

[A.W.] was a student in my 8th grade class. [A.W.] appeared to have several psychological problems, and I was unable to help her. The student had a problem telling the truth, and when she was confronted, she still refused to tell the truth. There was always some type of problem with her (fighting, talking back, and not doing her school work).

[A.W.] had deep-rooted problems that needed the services of a counselor. [A.W.] had the ability to be a good student, but, she was not working up to her potential.

/S/ Mrs. S. Jackson

O'Toole Elem

6550 S. Seeley"

The defendants' counsel before this court strenuously argues that these two unbiased and impartial elementary school teachers would not likely have presented these letters on behalf of the defendants, convicted of rape and other sex offenses upon their adopted minor

daughter, unless they knew the daughter to be a liar. The defendants' counsel was incompetent in not presenting at defendant's trial this pertinent and favorable testimony of these teachers of A.W.'s lack of credibility and veracity.

## B

A.W. additionally testified on direct examination that in June 1985 she was taken to and examined at a hospital. The prosecutor did not present evidence of A.W.'s hospital examination, and when the defendants' counsel inquired on cross-examination if her hospital examination revealed whether she "had been penetrated," strangely, the prosecutor objected:

"Q. Now after Mr. Williams had the intercourse with you were you taken to a doctor or taken to a hospital for treatment or observation?

A. In June 1985 I was.

Q. But did they find that you had been penetrated?

[ASSISTANT STATE'S ATTORNEY]: *Objection.*

THE COURT: Overrule the objection ***.

A. No. I don't know." (Emphasis added.)

If defendants' counsel examination of the hospital records revealed that A.W. "had not been penetrated," he had a valid basis for asking the question and he should have pursued the inquiry. Such records would have contradicted A.W.'s testimony and defendant Roy Williams' statement, the facts of which he contends were supplied by the police officer, that he had inserted his penis in A.W.'s vagina for 10 minutes. On the other hand, if defendants' counsel had no basis for asking the question, he should not have asked it. Additionally, it would seem that the prosecutor's objection to the question indicated that the prosecutor was aware that the hospital records revealed that A.W. "had not been penetrated," which, thus, contradicted A.W.'s testimony and the content of defendant Roy Williams' statement that he had inserted his penis in her vagina for 10 minutes. It is reasonable to surmise that the prosecutor knew that the hospital examination revealed that A.W. "had not been penetrated" and therefore he did not offer the hospital records in evidence, and, for that reason he also objected to defendants' attorney's inquiry in that area.

Defendants' counsel further pursued this inquiry, and oddly, the prosecutor further persisted in his objection:

"Q. Who was that that examined you?

A. A doctor.

Q. At what place?

A. In University of Chicago Hospital.

Q. So the University of Chicago found that *you had not been penetrated, is that right*—

[ASSISTANT STATE'S ATTORNEY]: *Objection.*

THE COURT: Sustain the objection. The facts are not in evidence." (Emphasis added.)

Without passing on the validity of this ruling or the validity of the basis therefor by the trial court, it is apparent from the foregoing and the facts of the case that defendants' attorney should have persisted in further inquiry and presented the defendants' own evidence of the examining physician and hospital records on this subject area. He was incompetent in failing to do so.

C

Defendants' counsel neglected to present the favorable testimony of the other six residents who were in the house when A.W. stated the sex acts were committed. Defendants argue that A.W.'s testimony of their commission of the sex acts upon her and A.W.'s testimony of A.W. and codefendant Emmaline Williams parading nude in the house in which A.W. admitted that Tanya Bergen and A.W.'s siblings, Karen Williams and Dwight Williams, were present and in which defendant Roy Williams testified, without contradiction, that nine people lived at the time, is unworthy of belief. Defendants contend that their trial counsel was incompetent in not presenting the testimony of Tanya Bergen, Karen Williams and Dwight Williams and the other residents in the house to substantiate and corroborate their denials of the commission of the criminal acts attributed to them.

D

The defendants' attorney failed to present at trial favorable evidence of the defendants' background. The defendants' attorney did not present at trial the following favorable evidence, which would have enhanced defendant Roy Williams' credibility as a trial witness, but which was belatedly presented by his new attorney at the sentencing hearing. Defendant Roy Williams was 57 years of age and had no prior criminal record. He had lived in Chicago since 1941. He served honorably in the United States military from 1951 to 1953 and was honorably discharged. He had an employment work history until a few years previously when he was placed on disability, and he was a diabetic. Throughout the years he had been repeatedly investigated, approved and licensed by the Illinois Department of Children and Family Services to provide, and that he had provided, foster homes

for many children, three of whom he legally adopted. There had been no complaint regarding the children of any kind against him by the Department or by any other agency or person. The pastor of his church testified at his sentencing hearing that defendant Roy Williams was a good standing member and officer in the church and that his reputation for good character in the community was excellent.

The defendants' attorney failed to present at trial the following favorable evidence which would have enhanced codefendant Emmaline Williams' credibility as a trial witness. This evidence was tardily presented by her new attorney at her sentencing hearing. Codefendant Emmaline Williams was 45 years of age and had no prior criminal record. She had been steadily employed most of her adult life. She, too, and her home, had been investigated, approved and licensed by the Illinois Department of Children and Family Services for the placement of 13 foster children in her home, several of whom were adopted by her under the auspices of the Department. She was a licensed foster parent. Her clergyman related that Mrs. Williams was president of her church choir, a church official, helped in Sunday school and that she regularly attended church. Her clergyman further related that Mrs. Williams' reputation in the community for good character was excellent.

The defendants' trial counsel was incompetent in not presenting at trial this favorable evidence of the defendants' background bearing upon their credibility as witnesses.

## IX

### THE DEFENDANTS' COUNSEL DID NOT OBJECT TO THE ADMISSION OF IRRELEVANT PREJUDICIAL TESTIMONY ABOUT THE COMPLAINT FOR A SEARCH WARRANT AND THE SEARCH WARRANT.

Predicated on his conversation with A.W., Officer Lux on June 17, 1985, subscribed, swore to and presented to a judge a complaint for the issuance of a search warrant to search the defendants' home. Practically every legal objection imaginable was available to prohibit admission of testimony about the complaint and search warrant as evidence against the defendants on trial for the commission of offenses allegedly committed in April 1984, 15 months previously. The complaint and search warrant were irrelevant as evidence. More importantly, the complaint for the search warrant contained rank, prejudicial, irrelevant, inadmissible hearsay of the defendants' commission of unrelated offenses for which the defendants were not on trial. Yet,

the defendants' attorney neglected to object to this testimony. The complaint for the search warrant in pertinent part is set forth in the following appendix No. 2. The defendants contend that it reads more like fantasized fiction than possible realistic facts.

Codefendant Emmaline Williams testified on cross-examination, without any objection from defendants' counsel:

"Q. Well, when the police came to your house on June 17, 1985, they had a search warrant that they showed, didn't they?

A. They had a piece of paper with my name on it but I don't know that it was a search warrant or not. I never seen a search warrant before.

Q. After they handed you that piece of paper is when they began to search the place?

A. No, sir. ***

[ASSISTANT STATE'S ATTORNEY]: *** [I]'want to mark what I have in my possession as People's Exhibit Number 3, for identification ***.

THE COURT: Defense attorney *** do you have any objection to showing the witness the exhibit?

[DEFENSE ATTORNEY]: *No objection.*

THE COURT: *Accordingly *** you may approach the witness and question her in reference to this.*

[ASSISTANT STATE'S ATTORNEY]: Mrs. Williams, I'm going to show you People's Exhibit Number 3, for identification *** isn't that the document that the police officers gave to you when they came to your house on June 17, 1985?
* * *
A. *** [N]o sir. This is not what they gave me. It was a piece of paper like this. They had my name on it. No, sir. I never seen that before.

Q. You never saw this search warrant before?

A. I never saw that before. He did not give me that." (Emphasis added.)

Not being satisfied with having successfully elicited this foregoing irrelevant prejudicial testimony about the search warrant from codefendant Emmaline Williams, the prosecutor went further and elicited additional inadmissible testimony about the search warrant from Officer Lux on rebuttal, as follows:

"Q. *** [W]hen you went to arrest Emmaline Williams did you have a search warrant for the premises at that house?

A. Yes, I did.

Q. And in fact did you present the occupant of that house

with a search warrant upon entry into that house?

A. Yes.

Q. And that was Emmaline Williams?

A. Yes, it was.''

From the totality of the pretrial, the trial, and the post-trial proceedings in the case at bar, as previously herein set forth, it is clear, there can be no doubt, and it cannot be seriously or persuasively debated to the contrary that the defendants did not receive competent legal representation on their trial.

## X

### THE DEFENDANTS WERE DENIED THEIR FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL BY THEIR ATTORNEYS' INCOMPETENT AND INADEQUATE PERFORMANCE.

The majority mistakenly rely on *People v. Harris* (1988), 123 Ill. 2d 113, as authority for rejecting the defendants' valid and well-founded claim that their trial attorney was incompetent. I, too, rely on *Harris* as authority that their trial attorney was incompetent, and patently so.

In *Harris*, the multiple defendants were felony inmates of a State penal institution. They were also gang members and were convicted of murdering a felony, rival gang member inmate. Harris contended for reversal that he was denied the effective assistance of counsel because his trial counsel (1) "inadequately handled the situation regarding a juror," with whom a counselor in the penal institution had communicated about the case; (2) inadequately cross-examined key prosecution witnesses; and (3) presented an inadequate closing argument. The supreme court significantly noted, *"In deciding this issue [of denial of the effective assistance of counsel], we note that each of these defendants was individually represented,"* (123 Ill. 2d at 150) unlike in the case at bar. (Emphasis added.) 123 Ill. 2d at 150.

The *Harris* court relied on the two-part test for adjudicating ineffective assistance of counsel claims, which was pronounced in *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, in rejecting Harris' ineffective assistance of counsel claim. The *Harris* court pointed out that to establish ineffective counsel under the *Strickland* test, a defendant must show that (1) counsel's performance was so seriously deficient that it fell below an objective standard of reasonableness under prevailing professional norms; and

(2) the deficient performance so prejudiced the defense that it denied the defendant a fair trial. The *Harris* court additionally pointed out that the *Strickland* test requires a defendant to demonstrate that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding, *would* have been different.' " (Emphasis added.) (*Harris*, 123 Ill. 2d at 155, quoting *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) This requirement is counterfactual, which, by definition, defies proof. Obviously, the *Strickland* court recognized this impossibility, for the *Strickland* court immediately explained:

> "A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Under the foregoing two-prong *Strickland* test, relied on in *Harris*, there can be no doubt, and there is no rational doubt, that based upon the hereinbefore mentioned facts and circumstances, the defendants' counsel's performance in the case at bar was so seriously deficient that it falls below any objective standard of reasonableness under prevailing professional norms. Likewise, there can be no doubt, and there is no valid doubt, that the defendants' attorney's deficient performance so prejudiced the defense as to deny the defendants a fair trial. Because of defendants' counsel's unprofessional errors, there is indeed an abundant reasonable probability sufficient to undermine confidence in the outcome of the case.

The *Harris* court further noted that, under *Strickland*, a defendant must overcome the strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and that the challenged action might have been counsel's trial strategy. (*Harris*, 123 Ill. 2d at 155.) There is no rational process by which the defendants' counsel's previously noted and complained-of conduct in the case at bar can be considered or construed as reasonable professional assistance or sound trial strategy.

The supreme court announced in *Harris*, [D]efendant Harris has not shown that his trial counsel was incompetent. *** Defense counsel provided Harris with an adequate defense, and nothing he did resulted in prejudice to the defendant or would have changed the outcome of the trial." (123 Ill. 2d at 158.) Application of these tests in *Harris* compels reversal of the defendants' convictions in the case at bar and a new trial. These defendants have abundantly shown that their trial counsel was incompetent. He did not provide either defendant with any defense. The defendants have overwhelmingly demonstrated that their trial counsel's actions and inactions "resulted in

prejudice to the defendants." Perhaps the defendants have not shown, and perhaps they cannot ever show, that *"nothing he did * * * would have changed the outcome of the trial,"* as stated in *Harris*. (Emphasis added.) (123 Ill. 2d at 158.) But the defendants have clearly shown that had their attorney properly done *what their attorney did not do*, it would, and most assuredly could, have changed the outcome of the trial.

In the case at bar, the defendants' counsel failed: (1) to file a pretrial discovery motion; (2) to familiarize himself with and utilize the pretrial discovery material voluntarily furnished him by the State; (3) to make a motion to suppress defendant Roy Williams' statement; (4) to make a motion for severance on behalf of codefendant Emmaline Williams; (5) to object on behalf of codefendant Emmaline Williams to the admission of defendant Roy Williams' statement into evidence; (6) to move the trial court to confine its consideration of defendant Roy Williams' statement to him; (7) to move the trial court not to consider defendant Roy Williams' statement as evidence against codefendant Emmaline Williams; (8) to learn of the existence, in his own file, of A.W.'s prejudicial, inadmissible hearsay statement, People's exhibit No. 1; (9) to object to the admission of A.W.'s prejudicial, inadmissible hearsay statement into evidence; (10) (he did not know and he could not have known) to cross-examine A.W. on the flagrant inconsistencies, contradictions and omissions between her trial testimony and her statement; (11) to present evidence which would have adversely affected A.W.'s credibility as a witness; (12) to present evidence which would have enhanced the defendants' credibility as witnesses; (13) to present hospital records, the testimony of Tanya Bergen and other favorable evidence on behalf of defendants; (14) to object to the admissions of search warrant testimony and other prejudicial inadmissible evidence admitted against the defendants; (15) to object to the prosecutor's improper arguments; and (16) to make proper argument. During the entire pretrial, trial and post-trial proceedings, the defendants' attorney objected only five times, one of which he apologized for making, one was sustained and three were overruled. The incompetent performance of the defendants' counsel in the case at bar was far more egregious than was the defendants' attorney's incompetent performance in *Kimmelman v. Morrison* (1986), 447 U.S. 365, 90 L. Ed. 2d 305, 106 S. Ct. 2574, in which, for that reason, the defendants' conviction for the rape of a 15-year-old girl acquaintance was invalidated. For the same reason, the defendants' convictions in the case at bar should be likewise invalidated.

In *Kimmelman*, the victim testified that the defendant, her em-

ployer, took her to his apartment, where he forced her into his bed and raped her. Upon returning home the victim told her mother what had happened. The police were summoned, and the victim accompanied them to the defendant's apartment, into which they were admitted by another tenant in the building. The officers seized the sheet from the defendant's bed. The defendant's attorney failed to file a pretrial discovery motion, and he also failed to file a motion to suppress the sheet as evidence because he did not know of its seizure or of the State's intent to use it as evidence. The sheet was admitted as evidence against the defendant. The defendant was convicted. The defendant contested the constitutional validity of his conviction in a *habeas corpus* proceeding in the Federal court on the ground that his trial attorney's failure to have filed a pretrial discovery motion, and particularly his failure to have filed a motion to suppress the sheet, on the ground that it was seized in violation of his fourth amendment constitutional right to be secure in his home against unreasonable search and seizure, denied him his sixth amendment constitutional right to the effective assistance of counsel. The Supreme Court held:

"Where a State obtains a criminal conviction in a trial in which the accused is deprived of the effective assistance of counsel, the 'State *** unconstitutionally deprives the defendant of his liberty.' [Citation.] The defendant is thus 'in custody in violation of the Constitution' ***.

\* \* \*

*** 'Counsel *** has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.' [Citation.] *** Because that testing process generally will not function properly unless defense counsel has done some investigation into the prosecution's case and into various defense strategies, we noted that 'counsel has a duty to make reasonable investigations ***.' [Citation.] ***

The trial record in this case clearly reveals that Morrison's attorney failed to file a timely suppression motion, not due to strategic considerations, but because, until the first day of trial, he was unaware of the search and of the State's intention to introduce the bedsheet into evidence. Counsel was unapprised of the search and seizure because he had conducted no pretrial discovery. ***

Viewing counsel's failure to conduct any discovery from his perspective at the time he decided to forego that stage of pretrial preparation and applying a 'heavy measure of deference,' [citation], to his judgment, we find counsel's decision unreason-

able, that is, contrary to prevailing professional norms. *** Respondent's lawyer neither investigated, nor made a reasonable decision not to investigate, the State's case through discovery. Such a complete lack of pretrial preparation puts at risk both the defendant's right to an 'ample opportunity to meet the case of the prosecution,' [citations] and the reliability of the adversarial testing process." 477 U.S. at 383, 384, 385, 91 L. Ed. 2d at 324, 325-26, 106 S. Ct. at 2587, 2588-89.

Although in the case at bar, unlike in *Kimmelman v. Morrison*, the State voluntarily furnished the defendant's counsel with the pretrial discovery material, the distinction is one of form only, because, as previously demonstrated, the defendants' counsel in the case at bar failed to familiarize himself with and to properly utilize the discovery material furnished him. In the case at bar, just as the Supreme Court concluded in *Kimmelman v. Morrison*, "At the time Morrison's attorney decided not to request any discovery, *he did not*—and, because he did not ask, could not—*know what the State's case would be.* *** We therefore agree with the District Court and the Court of Appeals that the assistance rendered respondent by his trial counsel was constitutionally deficient." (Emphasis added.) 477 U.S. at 387, 91 L. Ed. 2d at 327, 106 S. Ct. at 2589.

The performance of defendants' single attorney before and during the defendants' joint trial in the case at bar was flagrantly incompetent, vulgarly inadequate and conspicuously violated the defendants' Federal and State constitutional rights to the effective assistance of counsel.

XI

THE SIMULTANEOUS REPRESENTATION OF THE MULTIPLE DEFENDANTS, WHO HAD ADVERSE, CONFLICTING, INCONSISTENT AND ANTAGONISTIC RIGHTS, INTERESTS AND CONCERNS, ALSO VIOLATED THE DEFENDANTS' FEDERAL AND STATE CONSTITUTIONAL RIGHTS TO THE EFFECTIVE ASSISTANCE OF COUNSEL.

The sixth amendment to the United States Constitution and article I, section 8, of the Illinois Constitution conferred upon the defendants the right to counsel who was not hobbled and who was unfettered by divided loyalties. (*State v. Sneed* (1974), 284 N.C. 606, 610, 201 S.E.2d 867, 869-70.) The defendants' said constitutional rights to the effective assistance of counsel were violated by their single attorney's representation of both defendants in their joint trial where the

defendants had conflicting, inconsistent, antagonistic or adverse concerns, rights or interests. A review in chronological sequence of the decisions of the Supreme Court of the United States and the supreme court of Illinois defines and proclaims this constitutional principle.

In *Glasser v. United States* (1941), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457, a multiple-defendant trial, over the defendant's objection, the trial court appointed his attorney to also represent a codefendant, in spite of notice to the trial court that their interests may be conflicting or inconsistent. Both were convicted. On appeal, the defendant contended for reversal that his attorney's simultaneous representation of him and a codefendant during their joint trial embarrassed and inhibited his attorney's conduct of his defense and prevented him from adequately safeguarding the defendant's right to have incompetent evidence excluded and from fully cross-examining the witnesses for the prosecution. The Supreme Court agreed and held, "[T]he 'assistance of counsel' guaranteed by the Sixth Amendment contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests. If the right to the assistance of counsel means less than this, a valued constitutional safeguard is substantially impaired." (315 U.S. at 70, 86 L. Ed. at 699, 62 S. Ct. at 465.) The *Glasser* court further held that, "To preserve the protection of the Bill of Rights for hard-pressed defendants, we indulge every reasonable presumption against the waiver of fundamental rights" (315 U.S. at 70, 86 L. Ed. at 699, 62 S. Ct. at 465), and that, "[u]pon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused ***. *** The trial court should protect the right of an accused to have the assistance of counsel" (315 U.S. at 71, 86 L. Ed. at 699, 62 S. Ct. at 465).

In *Glasser*, similar to the case at bar, the defendant argued that certain testimony, inadmissible as to him, was allowed into evidence without objection by his attorney on his behalf because his attorney desired to avoid prejudice to the codefendant. The Supreme Court pointed out that the single attorney "struggle[d] to serve two masters" (315 U.S. at 75, 86 L. Ed. at 702, 62 S. Ct. at 467) during the defendant and codefendant's joint trial and reversed the defendant's conviction because the attorney's dual representation denied the defendant's right to have the effective assistance of counsel, guaranteed by the sixth amendment. The court concluded that it was unnecessary to determine if the defendant was prejudiced by his attorney's joint representation of the codefendant because *"[t]he right to have the assistance of counsel is too fundamental and absolute to allow*

*courts to indulge in nice calculations as to the amount of prejudice arising from its denial,"* and that *"it is especially important that [defendant] be given the benefit of the undivided assistance of his counsel."* (Emphasis added.) 315 U.S. at 76, 86 L. Ed. at 702, 62 S. Ct. at 467-68.

Although in *Glasser*, the attorney represented the codefendant by court appointment, whereas in the case at bar the attorney apparently was retained by the defendant and codefendant, the hereinafter discussed authorities decided subsequent to *Glasser* point out that such distinction is without merit.

The three defendants were convicted of rape and robbery in *Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173. Harold Hall, a public defender, was appointed to represent all three defendants. The defendants' several and repeated motions, presented by Hall, for appointment of separate counsel for each defendant, because of "a possibility of a conflict of interest in each of their cases," were denied. (435 U.S. at 477, 55 L. Ed. 2d at 430, 98 S. Ct. at 1175.) The Supreme Court pointed out in *Holloway* its holding of "[m]ore than 35 years ago in *Glasser*" (435 U.S. at 481, 55 L. Ed. 2d at 432, 98 S. Ct. at 1177) that the multiple defendants' single attorney "focused explicitly on the probable risk of a conflict of interests. The trial judge then failed either to appoint separate counsel or to take adequate steps to ascertain whether the risk was too remote to warrant separate counsel. We hold that the failure *** deprived petitioners of the guarantee of 'assistance of counsel.'" (435 U.S. at 484, 55 L. Ed. 2d at 434, 98 S. Ct. at 1178-79.) The Supreme Court additionally held in *Holloway*:

> ■ [D]efense attorneys have the obligation, upon discovering a conflict of interests, to advise the courts at once of the problem.
>
> * * *
>
> ■ *** *Glasser requires reversal, even in the absence of a showing of specific prejudice to the complaining codefendant, whenever a trial court improperly permits or requires joint representation.*
>
> * * *
>
> ■ *** [T]he assistance of counsel is among those 'constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error.'
>
> * * *
>
> ■ *** [A] rule requiring a defendant to show that a conflict of interests *** prejudiced him in some specific fashion would not

be susceptible of intelligent, even handed application." (Emphasis added.) 435 U.S. at 485, 487, 489, 490, 55 L. Ed. 2d at 435, 436, 437, 438, 98 S. Ct. at 1179, 1180, 1181, 1181-82.

The convictions in *Holloway* were reversed, the court noting, "[j]oint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing. For example, in this case it may well have precluded defense counsel for Campbell from exploring possible plea negotiations and the possibility of an agreement to testify for the prosecution, provided a lesser charge or a favorable sentencing recommendation would be acceptable. Generally speaking, a conflict may also prevent an attorney from challenging the admission of evidence prejudicial to one client but perhaps favorable to another, or from arguing at the sentencing hearing the relative involvement and culpability of his clients in order to minimize the culpability of one by emphasizing that of another. Examples can be readily multiplied. The mere physical presence of an attorney does not fulfill the Sixth Amendment guarantee when the advocate's conflicting obligations have effectively sealed his lips on crucial matters. *** [I]n a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process." (Emphasis in original.) 435 U.S. at 489-90, 55 L. Ed. 2d at 438, 98 S. Ct. at 1181-82.

That the multiple-defendants' attorney was appointed by the court and requested appointment of separate counsel in *Holloway*, unlike in the case at bar, is no valid distinction for not applying *Holloway* to the case at bar.

Following *Holloway*, the supreme court of Illinois decided *People v. Franklin* (1979), 75 Ill. 2d 173, 179, which the court noted did "not involve the *Holloway* issue of joint representation of codefendants," but rather, a defense attorney's representation of a defendant who he had some years previously prosecuted as an assistant State's Attorney in an unrelated case. The court held however, "This court has repeatedly stated that a defendant's fundamental right to effective assistance of counsel entitles the person represented to the undivided loyalty of counsel and prohibits a defense attorney from representing conflicting interests or undertaking the discharge of inconsistent obligations. [Citations.] In furtherance of this fundamental right, this court has adopted a *per se* rule which provides essentially that where defense counsel is involved in an actual or potential conflict of interest, it is unnecessary for the defendant to establish actual prejudice, as prejudice is presumed by law." 75 Ill. 2d at 176.

After *Franklin*, the supreme court decided *Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708, which involved the sixth amendment constitutional validity of multiple-defendant representation at their separate State murder trials by their same two privately retained attorneys, without objection, raised in a collateral *habeas corpus* proceeding in the Federal court. The court of appeals held that "a criminal defendant is entitled to reversal of his conviction whenever he makes 'some showing of a possible conflict of interest or prejudice, however remote \*\*\*.' " (446 U.S. at 340, 64 L. Ed. 2d at 341, 100 S. Ct. at 1714.) The supreme court stated the issue before it was "whether the mere possibility of a conflict of interest warrants the conclusion that the defendant was deprived of his right to counsel." (446 U.S. at 345, 64 L. Ed. 2d at 344, 100 S. Ct. at 1716.) The court noted that "[d]efense counsel have an ethical obligation to avoid conflicting representations and to advise the court promptly when a conflict of interest arises during the course of trial." (446 U.S. at 346, 64 L. Ed. 2d at 345, 100 S. Ct. at 1717.) Such conflicts obviously existed in the case at bar, but defendants' counsel's incompetent performance clearly demonstrates that he was too incompetent to recognize them. The *Cuyler* Court observed that, under *Holloway*, multiple-defendant representation violates the sixth amendment right to the effective assistance of counsel if "it gives rise to a conflict of interest," and that a defendant, even though he may not have voiced any objection during the trial to the multiple representation, need only "demonstrate that an actual conflict of interest adversely affected his lawyer's performance." (446 U.S. at 348, 64 L. Ed. 2d at 346-47, 100 S. Ct. at 1718.) The Supreme Court concluded in *Cuyler*:

> "*Glasser* established that unconstitutional multiple representation is never harmless error. Once the Court concluded that Glasser's lawyer had an actual conflict of interest, it refused 'to indulge in nice calculations as to the amount of prejudice' attributable to the conflict. *The conflict itself demonstrated a denial of the 'right to have the effective assistance of counsel.' 315 U.S. at 76, 86 L. Ed. at 680, 62 S. Ct. at 457. Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief.*" (Emphasis added.) 446 U.S. at 349-50, 64 L. Ed. 2d at 347, 100 S. Ct. at 1719.

Because the court of appeals in *Cuyler* improperly held that the defendant was entitled to relief because he had shown that the multiple representation involved only a *possible* conflict of interest, rather

than an *actual* conflict of interest, adversely affecting his lawyer's performance, and did not weigh these conflicting contentions under the proper legal standard, the Supreme Court remanded the cause to the court of appeals for further proceedings.

*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, previously discussed herein, followed *Cuyler. Strickland*, however, did not involve the conflicts of multiple representation under the sixth amendment right to counsel. Rather, *Strickland* involved the competency of counsel during a guilty plea proceeding with regard to the sixth amendment right to the effective assistance of counsel. Accordingly, *Strickland* need not be here discussed on the impact of a single attorney's representation of multiple defendants with conflicting interests on the defendants' sixth amendment right to the effective assistance of counsel.

After *Cuyler*, the supreme court of Illinois decided *People v. Washington* (1984), 101 Ill. 2d 104, in which the defendant claimed a violation of his sixth amendment right to loyal counsel because he was represented in his Chicago murder trial, with his knowledge and approval, by an attorney who was also a prosecutor in Chicago Heights, whose police officers testified adversely to his interest at his pretrial motion to suppress which challenged the validity of his arrest by them. Although *Washington* did not involve conflicts arising out of multiple representation by the same attorney, as did *Cuyler*, nevertheless the supreme court relied upon, cited and extremely quoted from *Cuyler* in upholding the defendant's contention. The court held that it would "indulge in every reasonable presumption against waiver of a constitutional right," (101 Ill. 2d at 114) and concluded:

> "The assistance of counsel means assistance which entitles an accused to the undivided loyalty of his counsel and which prohibits the attorney from representing conflicting interests or undertaking the discharge of inconsistent obligations. (*People v. Franklin* (1979), 75 Ill. 2d 173; *People v. Kester* (1977), 66 Ill. 2d 162; *People v. Stoval* (1968), 40 Ill. 2d 109.) In order to assure and protect these rights, the defendant need not show prejudice in order to justify a reversal of his conviction if the attorney representing him has an actual or possible conflict of professional interests. *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457 ***." 101 Ill. 2d at 110.

The *Washington* court noted that in *People v. Stoval* (1968), 40 Ill. 2d 109, the defendants' court-appointed lawyer, individually and as a member of a law firm, had previously represented the corporation which owned, and the operator of, the jewelry store that the defend-

ant was alleged to have burglarized. In reversing the defendant's conviction the court stated that it was concerned by the subliminal effects of the conflict on counsel and held that sound public policy prohibits representation by an attorney with such a possible conflict of interests. The *Washington* court further observed that in *Stoval* the court cited *Glasser* and stated that in such a case "there is no necessity for the defendant to show prejudice" (*Washington*, 101 Ill. 2d at 110) and that *Stoval* was referred to as establishing a *per se* rule in *People v. Coslet* (1977), 67 Ill. 2d 127. Then quoting from *Cuyler*, the court concluded in *Washington*:

> "The State contends that we should not apply our *per se* rule on attorney conflicts of interest in light of *Cuyler* \*\*\*. The State, in urging us not to apply the so-called *per se* test, but to adopt the 'actual conflict' test in *Cuyler* overlooks the fact that *Cuyler* involved multiple representation of defendants. \*\*\* In cases where codefendants are jointly represented by one attorney, a defendant must demonstrate 'an actual conflict of interest manifested at trial' in order to claim a denial of effective assistance of counsel. [Citations.] *When an actual conflict has been shown, it is unnecessary to demonstrate prejudice in order to sustain a claim of violation of the right to the assistance of counsel.* (*Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173; *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457; *People v. Stoval* (1968), 40 Ill. 2d 109.)" (Emphasis added.) *Washington*, 101 Ill. 2d at 112.

Following the Illinois Supreme Court's reversal of the defendant's conviction and remandment for a new trial, the State in *Washington* petitioned the United States Supreme Court for a writ of *certiorari*, which was denied. (*Illinois v. Washington* (1984), 469 U.S. 1022, 83 L. Ed. 2d 367, 105 S. Ct. 422.) Justice White dissented from the denial of *certiorari* in a written opinion, in which Chief Justice Berger and Justice Rehnquist joined. Justice White's dissenting opinion significantly observed that "[i]n *Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708, this Court held that in order to establish a Sixth Amendment violation, a defendant challenging his attorney's representation of multiple [defendants] must establish that the attorney's performance was affected by an actual conflict of interest, not merely a potential one. In the present case, [*People v. Washington* (1984), 101 Ill. 2d 104,] the Illinois Supreme Court held that *Cuyler's* actual conflict-of-interest standard was limited to multiple-representation situations. [Citation.] Because that holding is contrary to the

results reached by at least six other courts, I dissent from the denial of certiorari." (469 U.S. at 1022, 83 L. Ed. 2d at 367, 105 S. Ct. at 442 (White, J., dissenting).) After further noting in his dissenting opinion that the Illinois Appellate and Supreme Courts had held in *Washington* that the defendant was denied his sixth amendment right to the effective assistance of counsel because of his attorney's conflicting interest, Justice White stated:

> "*The Illinois Supreme Court adhered to the longstanding view that as a matter of federal constitutional law even a potential conflict of interest required a reversal*, rejecting the State's contention that *Cuyler v. Sullivan* required Washington to show that his attorney's performance had been adversely affected by an actual conflict of interest. \*\*\*  .
>
> Unlike the Illinois Supreme Court, numerous federal courts have failed to discern in *Cuyler* any limitation to cases involving multiple representation of defendants. [Citations.] Most of these courts have simply applied *Cuyler* to non-multiple-representation situations without even considering the possibility that it did not apply." (Emphasis added.) 469 U.S. at 1023, 83 L. Ed. 2d at 368, 105 S. Ct. at 442-43 (White, J., dissenting).

Unlike Justice White in *Washington*, I do not read or interpret the Illinois Supreme Court's decision in *Washington* as holding: (1) "*that as a matter of federal constitutional law even a potential conflict of interest required a reversal*"; or (2) that the Illinois Supreme Court in *Washington* rejected "the State's contention that *Cuyler v. Sullivan* required Washington to show that his attorney's performance had been adversely affected by an actual conflict of interest," as does Justice White. (Emphasis added.) 469 U.S. at 1023, 83 L. Ed. 2d at 368, 105 S. Ct. at 443 (White, J., dissenting).) Indeed, I interpret *Washington* quite the contrary.

The Illinois Supreme Court expressly held in *Washington* that where multiple defendants are represented by one attorney, "a defendant must demonstrate 'an *actual conflict* of interest manifested at trial' in order to claim a denial of effective assistance of counsel," and that when such "*actual conflict* has been shown, it is unnecessary to demonstrate prejudice in order to sustain a claim of violation of the right to the assistance of counsel." *Washington*, 101 Ill. 2d at 112.

In *People v. Jones* (1988), 121 Ill. 2d 21, 24, the supreme court stated that "[t]hese consolidated causes present the question whether joint representation of defendants establishes a sixth amendment claim of denial of the effective assistance of counsel when it is alleged that the admission of inculpatory and inconsistent pretrial statements

from each defendant created a conflict of interest." It must be borne in mind that the defendants in the case at bar also contend that all of the hereinbefore set forth inadequacies and incompetencies of their counsel's pretrial and trial performance establish a denial of their rights to the effective assistance of counsel, under the sixth amendment and article I, section 8, of the Illinois Constitution, and also that their joint representation with their conflicting interests at their trial by the same attorney likewise established a violation of the defendants' said constitutional rights to the effective assistance of counsel and to loyal, dedicated and fully committed counsel.

In *Jones*, Jones and Harris were jointly charged with armed robbery. Both were represented by two public defenders, who, the supreme court stated, "worked as a team on Harris and Jones' defense." After pointing out that "[i]t is not disclosed why each attorney did not represent an individual defendant," the supreme court then adamantly admonished, *"[i]t should be noted that such joint representation has been severely criticized.* (See *United States ex rel. Cole v. Lane* (7th Cir. 1985), 752 F.2d 1210, 1217 n.9.)" (Emphasis added.) 121 Ill. 2d at 24-25.

In *Jones*, the assistant State's Attorney who took pretrial statements from each defendant testified at their joint trial to the content of each of their statements. Jones' statement was inculpatory. Harris' statement was not. The trial court noted the inconsistencies in the two statements and called them to the attention of their joint attorney, who responded that he had not recognized the gravity of the conflicts in the two statements. Thereupon the prosecutor asked defense counsel to explain the precise nature of the conflict. The defendants' counsel was unable to clearly do so. In affirming the defendants' convictions, the supreme court significantly pointed out:

"[T]he issue of a conflict was first raised *sua sponte* by the trial court after Jones' statement was read into evidence by an assistant State's Attorney. During the ensuing bench discussion, defense counsel acknowledged that he had not previously recognized the 'gravity of the conflict in the statements.' Defense counsel went on to state that at that point he 'had only planned on putting on one' defendant to testify. As the trial proceeded only Jones testified, and he repudiated his earlier statement inculpating Harris and gave testimony corroborating Harris' exculpatory post-arrest statement. At the close of the People's case, the court invited defense counsel to move for mistrial if they thought a conflict was present. When proceedings resumed the next day, defense counsel moved for mistrial, but

based the motion largely on certain surprise testimony of the victim. While the conflict issue was obliquely referred to, counsel failed to articulate the nature of the conflict, and the motion for mistrial was denied.

Based upon this record, we find that the actions and comments of defense counsel were insufficient assertions of a conflict of interest to merit reversal under *Holloway* \*\*\*.

\*\*\* [D]efense counsel did not seek severance or appointment of separate counsel. Moreover, the potential conflict was raised only by the trial court *sua sponte*. Finally, when given an opportunity to seek mistrial on the basis of conflict, counsel was utterly unable to articulate how its defense strategy was inhibited or even affected by the alleged conflict. \*\*\*

\*\*\* Where the record presents no indication that the defense of either codefendant was inhibited to any degree because of the joint representation, a reversal of a conviction is not required. [Citation.]

\*\*\* [W]e conclude that there was no conflict present here which adversely affected Harris' representation \*\*\*. \*\*\* [I]t is clear that defense counsel were unaware of even the possibility of a conflict until the court called their attention to it. After discussion of the matter, defense counsel chose to pursue their original plan \*\*\*." (121 Ill. 2d at 28-30.)

*Jones* utterly fails to validate the attorney's disloyal joint representation of the multiple defendants in the case at bar.

*People v. Ross* and *People v. Mosely* were consolidated before the supreme court in *Jones*. Ross and Mosely were charged with the robbery-murder of a pizza deliveryman. In their separate pretrial statements each admitted his involvement as a lookout but attributed the actual murder to the other. At trial Ross and Mosely were represented by the same attorney. No severance motion was made. Defense counsel, in his opening statement, briefly commented that the defendants' statements were merely "inconsistent." During his presentation of the defense, defense counsel urged that both defendants' statements were coerced and that neither defendant had been involved in the shooting. Mosely so testified. Ross did not testify. Both were convicted. The appellate court reversed. The supreme court concluded:

"[W]e find that a conflict existed which was apparently resolved to Mosley's detriment. We therefore find that Mosley was denied effective assistance of counsel, and affirm the appellate court as to Mosley. \*\*\*

\* \* \*

\*\*\* Ross' inculpatory statement was used against Mosley, but Ross did not testify at trial. Thus, this damaging testimony went before the fact finder unrepudiated and unimpeached. We need not speculate as to the reasons for Ross' decision not to testify. It is enough to say that that decision did not operate to Mosley's benefit, and that counsel with no conflict, perhaps at separate trials, would surely have proceeded differently. If Ross' statement was not to be repudiated, counsel with no conflict would have at least sought to impeach it. We therefore find that a conflict of interest arose which manifested itself at trial to Mosley's detriment. The presence in evidence of Ross' statement implicating Mosley violated Mosley's right to confrontation. (See *Bruton v. United States* (1968), 391 U.S. 123, 20 L. Ed. 2d 476, 88 S. Ct. 1620.) The joint representation of the two defendants in one trial created a clear conflict as to Mosley \*\*\*." 121 Ill. 2d at 32, 33-34.

The hereinbefore detailed circumstances in the case at bar clearly and indeed affirmatively establish that the defenses of these defendants were inhibited, restricted and conflicted because of their representation by the same disloyal attorney, who was also incompetent.

Whether Justice White's aforesaid interpretation of the Illinois Supreme Court's analysis and application of *Cuyler* and the sixth amendment right to the effective assistance of counsel in *Washington* is in accord with the actual views of the Illinois Supreme Court expressed therein, or is misapprehended by Justice White, Illinois courts have a duty and certainly the right to interpret their own similar Illinois constitutional guarantee of the right to counsel (Ill. Const. 1970, art. I, §8). It is therein provided that in all criminal prosecutions, the accused shall have the right to appear and defend in person and by counsel. Illinois courts may interpret Illinois constitutional provisions as confining greater rights than similar Federal constitutional provisions, as interpreted by the United States Supreme Court.

In *People v. Van Cleve* (1982), 89 Ill. 2d 298, article VI, section 6, of the Illinois Constitution, which provides in pertinent part "that after a trial on the merits in a criminal case, there shall be no appeal from a judgment of acquittal" (Ill. Const. 1970, art. VI, §6) was involved. After a jury found Van Cleve and his codefendant guilty of rape and unlawful restraint, the trial court set aside the verdicts and entered judgments of acquittal notwithstanding the verdicts. The State appealed. The supreme court pointed out that article I, section 10, of the Illinois Constitution expressly prohibited double jeopardy, "No person shall \*\*\* be twice put in jeopardy for the same offense."

(Ill. Const. 1970, art. I, §10.) The supreme court held, "It is reasonable to conclude that the Constitution's provision in article VI, section 6, was to provide rights and protections beyond those assured by the double jeopardy clause. We consider that the provision was intended to apply to the type of·judgment of acquittal we have here, where there will not be a retrial of the defendant and therefore no involvement of the double jeopardy clause." *Van Cleve*, 89 Ill. 2d at 306.

In *Illinois v. Gates* (1983), 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317, after expressly rejecting the *Aguilar—Spinelli* two-pronged "veracity-reliability" and "basis of knowledge" tests, and adopting a new "totality of the circumstances" approach in determining whether probable cause existed for the issuance of a search warrant, Justice Rehnquist, on behalf of the five-member majority, regarding the court fashioning a "good-faith" exception modifying the exclusionary rule, stated:

> "Likewise, 'due regard for the appropriate relationship of this Court to state courts,' [citation] demands that those courts be given an opportunity to consider the constitutionality of the actions of state officials, and, equally important, proposed changes in existing remedies for unconstitutional actions. Finally, by requiring that the State first argue to the state courts that the federal exclusionary rule should be modified, *we permit a state court*, even if it agrees with the State as a matter of federal law, *to rest its decision on an adequate and inadequate state ground.* [Citation.] Illinois, for example, adopted an exclusionary rule as early as 1923 [citation], and might adhere to· its view even if it thought we would conclude that the federal rule should be modified." (Emphasis added.) 462 U.S. at 221-22, 76 L. Ed. 2d at 537-38, 103 S. Ct. at 2323.·

Justice White stated in his concurring opinion in *Gates*:

> "The Court correctly notes that Illinois may choose to pursue a different course with respect to the state exclusionary rule. If this Court were to formulate a 'good faith' exception to the federal exclusionary rule, the Illinois Supreme Court would be free to consider on remand whether the state exclusionary rule should be modified accordingly. * * * The Illinois Supreme Court found not only a violation of the Fourth Amendment but also of article I, §6, of the Illinois Constitution, which also provides assurance against unreasonable searches and seizures. * * * Illinois Courts should be given the opportunity to consider in the first instance whether a 'totality of the circumstances' test should replace the more precise rule of *Aguilar* and *Spinelli*.

*The Illinois Supreme Court may decide to retain the established test for purposes of the State Constitution just as easily as it could decide to retain an unmodified exclusionary rule."* (Emphasis added.) 462 U.S. at 251, 252, 76 L. Ed. 2d at 556, 557, 103 S. Ct. at 2339, 2339-40 (White, J., concurring).

After *Gates*, the Illinois Supreme Court decided *People v. Exline* (1983), 98 Ill. 2d 150, in which the sole issue was whether the allegations in an affidavit for a search warrant established probable cause for the issuance of a search warrant. The majority held that the allegations were sufficient. Justice Goldenhersh, dissenting, stated:

"There is another aspect of the case which the majority did not consider. This court decided *Gates* on the basis of the fourth amendment to the Constitution of the United States and article I, section 6, of the Constitution of Illinois. *As was pointed out in both the majority opinion and Justice White's concurrence in Gates, we are not required to blindly follow the action taken by the Supreme Court in determining the standards applicable under our own Constitution.* In his eloquent dissent in *Gates*, Justice Brennan has stated far better than can I the reasons for *** retaining the tests and standards enunciated in *Aguilar* and *Spinelli*. *I would retain those tests and standards as constitutional requirements in Illinois."* (Emphasis added.) 98 Ill. 2d at 157-58 (Goldenhersh, J., dissenting).

*People v. Tisler* (1984), 103 Ill. 2d 226, followed *Exline*. *Tisler* involved the constitutional validity of the defendant's arrest, which he contended was without probable cause. In ruling adversely to the defendant on this issue, the supreme court additionally stated:

"[D]efendant points out that Illinois may afford its citizens greater protection than that provided by the United States Constitution. ***

*** Defendant asserts that article I, section 6, of the 1970 Illinois Constitution guarantees more individual rights than either the former State Constitution or the fourth amendment to the Federal Constitution. ***

*** The [1970 constitutional] convention manifested no intent to expand the nature of the protection afforded by the fourth amendment of the Federal Constitution. *** [T]he fourth amendment to the United States Constitution is the direct and lineal ancestor of the protection afforded by the Illinois Constitution. Both constitutional provisions were designed to protect against the same abuses. ***

With respect to the basic requirements that stem from the

language of our constitution, this court has considered that the State and Federal constitutions impose the same restrictions. [Citation.] In both *People v. Greer* (1981), 87 Ill. 2d 89, 92, and *People v. Gates* (1981), 85 Ill. 2d 376, 381-82, this court referred to both the protection of the fourth amendment to the Federal Constitution and of article I, section 6, of the Illinois Constitution of 1970. *** [T]he protection against unreasonable searches under the Illinois Constitution is measured by the same standards as are used in defining the protection against unreasonable searches contained in the fourth amendment to the United States Constitution.

*** *[T]his Court may construe these terms as contained in our constitution differently from the construction the Supreme Court has placed on the same terms in the Federal Constitution.* *** [T]his court has, in the past, in construing provisions of our constitution, elected to follow the decisions of the Supreme Court rendered in construing similar provisions of the Federal Constitution. *** 'We have indicated before that we will follow the decisions of the United States Supreme Court on identical State and Federal constitutional problems.' [Citation.]

\* \* \*

We must find in the language of our constitution, or in the debates and the committee reports of the constitutional convention, something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution, after which they are patterned." (Emphasis added.) 103 Ill. 2d at 241, 242-43, 244, 245.

Justice Ward meaningfully remarked in his concurring opinion in *Tisler* that at a national conference on the development of State constitutional law, in 1984, co-sponsored by the Conference of Chief Justices, The National Center for State Courts and the Marshall-Wythe School of Law, the American Bar Association held an appellate judges seminar, entitled, "The Use of State Constitutions," which addressed "questions such as whether State courts may reach different conclusions under State constitutions from those the Supreme Court has reached under the Federal Constitution and, in the event of difference, which shall prevail." (*Tisler*, 103 Ill. 2d at 253 (Ward, J., concurring).) Justice Ward additionally noted "that a State court is free to interpret its constitution as it wishes as long as its interpretation is not more restrictive than the interpretation the Supreme Court has given parallel provisions of the Constitution of the United States,"

and "a court, in interpreting a constitution is to ascertain and give effect to the intent of the framers of it and the citizens who have adopted it." (103 Ill. 2d at 253-54 (Ward, J., concurring).) Finally, Justice Ward noted that, "[t]he majority holds that the constitutional delegates did not manifest an intent to expand the protection afforded by the fourth amendment to the Constitution, other than to add provisions giving protection against eavesdropping and invasions of privacy." 103 Ill. 2d at 254 (Ward, J., concurring).

Justice Clark also authored a concurring opinion in *Tisler*, in which he stated, "I cannot agree that, because in the past we have looked to the Supreme Court for guidance and to make sure that our citizens have been afforded at least the minimum Federal requirements under the Constitution, we have in essence adopted the Supreme Court's interpretation of any amendment of the Federal Constitution as our interpretation of similar provisions of our own constitution. *There is nothing which prevents this court from interpreting our constitution as affording greater protection than similar provisions of the Federal Constitution.*" (Emphasis added.) (103 Ill. 2d at 258).) Justice Clark further stated, "I believe the majority's stance on this issue is dangerous because it limits our power to interpret our own State Constitution in the future. *** Under the majority's analysis, this court would be precluded from protecting the civil liberties of Illinois citizens should the United States Supreme Court decide to consistently favor police efficiency over the rights of the accused," (103 Ill. 2d at 259 (Clark, J., concurring)) and concluded:

> "Today, the United States Supreme Court has been cutting back on the individual liberties *** while State supreme courts have attempted to protect civil liberties in State constitutions. [Citation.]
>
> This tradition of judicial independence has a long history in Illinois. This is a court that banned prayer in public schools 50 years before the United States Supreme Court [citations] and adopted the exclusionary rule decades before the United States Supreme Court held this rule applicable to the States [citations]. Thus, the idea that the Illinois Constitution is co-extensive with the United States Constitution is a recent theory without support in the prior decisions of this court.
>
> *** [A] majority of jurisdictions that have considered the question have ruled that State constitutions can provide greater protection of civil liberties than the United States Constitution.

* * *

I disagree with the majority's belief that '[w]e must find \*\*\* something which will indicate that the provisions of our constitution are intended to be construed differently than are similar provisions in the Federal Constitution.' [Citation.]

\* \* \*

Justice Brandeis noted that our system of government allows States a certain degree of latitude in running their own affairs. [Citation.] I prefer this latitude to the crushing degree of uniformity advocated by the majority." 103 Ill. 2d at 260, 261, 263 (Clark, J., concurring).

Justice Goldenhersh dissented in *Tisler,* in which Justice Simon joined, and stated, "I state my concurrence with the views expressed by Justice Clark concerning this court's interpreting our constitution to afford greater protection than do purportedly similar provisions of the Federal Constitution. As I said in my dissent in *People v. Exline* (1983), 98 Ill. 2d 150, 157, *'we are not required to blindly follow the action taken by the Supreme Court in determining the standards applicable under our own constitution.'* " (Emphasis added.) 103 Ill. 2d at 263-64 (Goldenhersh, J., dissenting, joined by Simon, J.).

On its authority and indeed its duty to interpret the rights and guarantees provided in the Illinois Constitution unconfined by the United States Supreme Court's more restricted interpretation which further limits such rights under similar provisions of the United States Constitution, Justice Stamos, speaking for a five-member majority in *People v. Duncan* (1988), 124 Ill. 2d 400, eloquently proclaimed:

"[I]t is clear that the Illinois courts have for about a century warily approached the admissibility of nontestifying codefendants' statements and have done so quite independently of the Federal constitutional doctrine underlying both *Bruton* and *Richardson.* \*\*\* [F]rom early times, Illinois case law has evolved without reliance on the sixth amendment to the Federal Constitution as in *Bruton* and has made the oft-repeated observation, grounded simply in fairness, that the incrimination of a defendant by admission into evidence of a nontestifying codefendant's statements incompetent against the defendant, even when the jury is given a limiting instruction, is 'very damaging' to the first defendant because 'it is very difficult for a juror to divest himself, under instructions, from the illegitimate effect of such evidence.' [Citations.]

\* \* \*

Rarely have our decisions on this general subject felt it nec-

essary to cite constitutional law as authority, and when they have done so it is evident from their choice of language that they were referring to the Illinois rather than the Federal Constitution. [Citations.] Indeed, it would have been surprising had our early court professed to base its rule on the Federal Constitution's sixth amendment, since it was not until 1965 that that amendment's guaranty of the right of confrontation was authoritatively held to be obligatory on the States by virtue of the fourteenth amendment. See *Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065.

In any event, and regardless of any degree to which the Illinois Constitution's right of confrontation may be incongruent with the Federal Constitution's, we need not find our long-established Illinois rule to be based expressly on the Illinois Constitution in order for the rule to serve in the case at bar as an adequate ground of decision, independent of the Federal constitutional doctrine recognized in *Bruton* and *Richardson*. [Citations.] Our rule has sufficient basis in the inherent authority of our courts to announce the law of evidence for the assurance of fair trials [citations] and in long-expressed concern of our and of other Anglo-American courts \*\*\*.

\*\*\* In addition, the admission of [Olinger's] statements at a joint trial, absent a total deletion of all references to defendant, violated established Illinois case law that is independent of *Bruton-Richardson* constitutional doctrine." 124 Ill. 2d at 413-15.

Justice Miller, in his specially concurring opinion in *Duncan*, in which Justice Moran concurred, did not disagree with Justice Stamos' aforesaid pronouncements in *Duncan*. Justice Miller simply concluded that, "[b]ecause Federal law provides a sufficient answer to the defendant's claims and the controversy may be disposed of on that ground alone, it is not necessary in this case to determine whether State law provides greater protection." 124 Ill. 2d at 416 (Miller, J., concurring, joined by Moran, J.).

The Illinois Supreme Court's latest interpretation of Illinois constitutional provisions as conferring greater rights than those conferred by a similar Federal constitutional provision, as interpreted by the United States Supreme Court, are pronounced in *People ex rel. Daley v. Joyce* (1988), 126 Ill. 2d 209. In *Joyce*, an Illinois statute, section 115—1 of the Code of Criminal Procedure (Ill. Rev. Stat. 1987, ch. 38, par. 115—1), in effect conferred upon the State the right to a jury trial in certain alleged narcotics violation cases. Article I, section 13, of the 1970 Illinois Constitution (Ill. Const. 1970, art. I, §13) pro-

vides that "[t]he right of trial by jury as heretofore enjoyed shall remain inviolate." The trial judge, the Honorable Donald S. Joyce, denied the State a jury trial under section 115—1 on the ground that said section violated the defendant's constitutional right to a jury trial and his concomitant right to waive his right to trial by jury. The State requested the supreme court to compel Judge Joyce to grant its request for a jury trial. The supreme court denied the State's request and noted that the right to trial by jury is guaranteed by similar provisions of the Federal Constitution, the sixth amendment, and the State Constitution, article I, section 13. The supreme court noted further that Rule 23(a) of the Federal Rules of Criminal Procedure, similar to section 115—1 of the Illinois Code of Criminal Procedure, also in effect conferred upon the government in criminal cases the right to a trial by jury and that Federal Rule 23(a) was held by the United States Supreme Court to be nonviolative of a defendant's sixth amendment jury trial right in *Singer v. United States* (1965), 380 U.S. 24, 13 L. Ed. 2d 630, 85 S. Ct. 783. The State in *Joyce* urged the same interpretation of the similar Illinois Constitution provision by the Illinois Supreme Court. The court rejected the State's argument, declined to do so, and in holding that section 115—1, conferring on the State a jury trial right, violated a defendant's Illinois constitutional right to a jury trial and his right to waive such right, stated:

> "This court's analysis, however, is not limited to Federal constitutional principles. If we find in the language of our constitution, or in the debates or committee reports of the constitutional convention, an indication that a provision of our constitution is intended to be construed differently than similar provisions of the Federal Constitution, then this court should not follow or be bound by the construction placed on the Federal constitutional provision. See *People v. Tisler* (1984), 103 Ill. 2d 226, 245.

> * * *

> *** [W]e should give our State constitutional provision meaning independent of the construction the Federal courts have placed on the jury trial provisions of the Federal Constitution." *Joyce*, 126 Ill. 2d at 213, 214-15.

Justice Clark's concurrence in *Joyce* was magnificently eloquent. He stated:

> "I know of no evidence—either in the convention debates, the explanations given to the ratifying voters, or in the committee reports—for the proposition that our Illinois Constitution of 1970 was intended to be construed in some instances not by the

supreme court of Illinois but, instead, by the Supreme Court of the United States. ***

&ast; &ast; &ast;

*** As to many of our State constitutional provisions—indeed as to most of them—our court has a long tradition of liberal construction in the service of individual rights. ***

*** Instead of assuming that similar State and Federal provisions are to be construed similarly, we could simply assume that *all* State constitutional provisions are to be construed *independently* of their Federal counterparts. [Emphasis in original.] By 'independently' I do not mean that the State constitutional provision must in every instance be given a broader or more liberal construction. All I mean is that as to our State constitutional provisions, Federal precedents are not *stare decisis*. ***

Given the existence of the Federal Bill of Rights, and the application, through the due process clause of the fourteenth amendment, of the bulk of its guarantees to the States, there would be little point in writing parallel guarantees into any State constitution if those guarantees were never to be interpreted more broadly. *** By including parallel guarantees in our State constitution, its drafters and ratifiers were, it seems to me, sending a clear message. The message was that they wanted the 'double protection' that only State constitutional guarantees could provide. They did not want our State constitution interpreted more broadly in every instance. But they at least wanted the security of knowing that the seven justices of this court would bring to bear on every important constitutional issue their independent resources of wisdom, judgment, and experience. ***

*** *The court has now held that our State constitutional protection provides broader rights of due process [citation],* *** *jury trial and confrontation* (*People v. Duncan* (1988), 124 Ill. 2d 400), *and freedom from cruel and unusual punishment* [citation]. [Emphasis added.] It is also possible that it provides a greater protection for the right against self-incrimination. [Citation.] The only clear line of authority remaining which favors a lockstep construction involves search and seizure. See, *e.g., People v. Tisler* (1984), 103 Ill. 2d 226 ***." 126 Ill. 2d at 223, 225, 226, 226-27 (Clark, J., concurring).

In 1868, the fourteenth amendment to the Constitution of the United States was adopted to confer upon all the people of the United

States the rights, guarantees and privileges, and to make binding upon the State the prohibitions, limitations and obligations contained in the first eight amendments to the Constitution of the United States, the Federal Bill of Rights. The Supreme Court of the United States successfully delayed the implementation of these rights by a prolonged and outright hostility in interpreting the fourteenth amendment. Nevertheless, there is presently no valid doubt that the fourteenth amendment now confers the cherished Federal constitutional Bill of Rights on those persons who were previously denied them and it prohibits the States from transgressing these rights. Because of the Supreme Court's interpretations and procrastinations, however, it has taken over 100 years for the fourteenth amendment to accomplish this intended and desired result. For State courts by their own interpretation of their own State constitutional provisions to now restrict State constitutional rights to an interpretation of a more limited right by the United States Supreme Court of a similar Federal constitutional provision would be a most undesired and ill-conceived aberration.

Under the foregoing authorities of *Glasser, Holloway, Franklin, Cuyler, Strickland, Stoval, Washington, Jones, Van Cleve, Gates, Exline, Tisler, Duncan* and *Joyce*, it is clear that Illinois courts may interpret and construe, and I do interpret and construe the rights of the defendants in the case at bar to counsel, guaranteed by article I, section 8, of the Illinois Constitution (and the sixth amendment to the United States Constitution), to have been violated by their attorney's multiple representation of them, because his performance on behalf of each of them was adversely affected by an actual conflict of interests between the defendants, and between the defendants and him, and that the defendants need not have shown prejudice therefrom, although they have abundantly done so.

It is also clear from the various trial inadequacies and deficiencies of defendants' attorney, as previously set forth herein, that he did not give, and indeed he was absolutely prevented from giving, his total commitment, his unswerving loyalty, and his unyielding dedication to protecting, pursuing and enforcing the rights and interests of each defendant during their joint trial. Predicated on the foregoing authorities, the defendants' right to the effective assistance of counsel guaranteed by the sixth amendment to the Constitution of the United States, made binding on the States by the fourteenth amendment, and the defendants' right to counsel provided in article I, section 8, of the Constitution of the State of Illinois were violated. The defendants' convictions should therefore be reversed and they are entitled to a new trial. Accordingly, I dissent.

# APPENDIX

THE VICTIM, A.W.'S STATEMENT
PEOPLE'S EXHIBIT NO. 1

"April of 1984—that night—blue pants, with a light green top—exactly 12:15—when I left the room 3:15.

Wednesday—The day before I was suspended from school. It was on Thursday when I was suspended for fighting.

She was on the toilet when she called me in there. It was the same night she bought me my Easter clothes and a coat. That night she called me down she was drunk too. She said A.W. I want you to do something I never asked anybody to do before. Please A.W. she said. Then said, 'Moma love you.' I was at the age of 13 in the 8th grade. She said will you do it. But she didn't tell me what. I said o.k. I'll do it. Then she got up flushed the toilet, and she said now come with me. She opened her bedroom door and daddy was just lying there naked with his clothes off. I looked. She said don't be scared we won't hurt you. I said 'What.' She said take off your clothes. I was holding my shirt greenish like, real light. I was in shock. I couldn't believe what had happened. I really thought I was going crazy. Then she said that's alright. I even tried to lie and said I am on my menstruation. She said that's o.k. I tried to open the door and get out of there but she held the door and down went my clothes. Before she told me to have sex with her husband she told me to roll up my _____ I had. Then she said now come over here. I didn't know what the hell I was doing. I wish it hadn't happened. Then I laid down and he told me to open my legs wide open and he rubbed some vaseline in my vagina. I hated it. I even hated him. And then it happened. I wouldn't open my legs open wide enough. That's all she kept saying try to bust her cherry. Then about 12:40 she said I have to go to the washroom. I'll be back. When she came back she bought some pepsi back with her. She asked me did I want any I said no. Then she said, 'A.W. try and get something on the radio.' She said anything you like. I turned the radio to WJPC. Lou Rawls was on singing You Going to Miss My Loving. Then she instructed me to lay back down. That time she was holding my arm while he was sucking on my breast. Then she said don't be so hard on her. Just play with her. And I still wouldn't act right. Then he asked me didn't it feel good. I said no. He said we're going to be nice to you. Then she said over the weekend I will let you sleep longer. I didn't say anything. Then he said me and your moma we love you. We're still going to buy a typewriter for you. Then she said when we move to Martin, Arkansas we're going to

have our own barbeque place and we'll pay you for working there. I didn't say nothing. A.W. if I die would you take care of daddy for me. I said yes. But I knew I won't. I was just scared. Then she said A.W. you not doing it right. Then she made me move over. While him and her did it. Then they stop and he said some of those boys out on the street are not going to be nice as I am. Then she said daddy can't get you pregnant. He had an operation. I still didn't say anything. Then they said again A.W. we love you. Then she said are you ready to go to bed. I said yes I am. Then she told me to put on my clothes and I went to the bathroom. She came with me. Then she said A.W. thank you. She hugged me. Me and her were both naked. She said A.W. you have a beautiful shape for your age. She started to feel on me and I moved from her. She said you don't think I am a freak do you. I said no. Then she said I am so thankful you did that for me. Then she kissed me and said I am going to bedroom. Goodnight.

I went to bed crying. I started to run away. Then I said no I can't. I have no where to go. The next morning I got up ready for school. She came upstairs. She said A.W. if you want to I'll keep you home and let you sleep. I said I'll go to school. She said A.W. you promise you'll never tell nobody what happened last night. I said I promise. She said thank you. I still love you. She said I am going to try to get that typewriter for you. Then me and the other kids at breakfast. I went to school and got into a fight with this girl and got suspended for 2 days. The assistant call home he said I'll be suspended for 2 days—Thursday and Friday. I came home. She said o.k. A.W. can go over Mrs. Gross he's mother house with Karen. Because both of them had to go somewhere. I don't know where we rode over there he came in and left us there. Then about 1½ hour later they came back. We went to a bread place. Picked up some bread. It was about 2:30 he came in the house. He said o.k. I have to go somewhere else. He said she can let Karen watch T.V. in the frontroom and the other kids when they come home and fix them a peanutbutter and jelly when they come home. Then he said give daddy a kiss for me please. I said no. He said o.k. then left. About 15 min she called and said did you all pick up the bread. I said yes. She said how do you feel I said I feel sore. She said rub a little vaseline between your legs. She said he didn't mess with you did he. I said yes he asked me for a kiss. I said no. She said o.k. I'll get at him. I told him to leave you alone.

Every since that day I had a hateful feeling toward them that I hated. She even tried to make me do it a couple of times in May. I said no. The last time she said she would pay me $10 to do it I said no. Then she brought him upstairs to my room. I had on an abun-

dance of clothes. I knew I would get them that time. I had on a short set connected with a top, pajamas bottom, my night gown and a robe. She tried to get them off and make me do it again. But found she couldn't so she left.

Every since that day we never got along with each other."

## APPENDIX NO. 2

### COMPLAINT FOR SEARCH WARRANT

"I, Youth Officer J. Lux No. 8027 a Police Officer of the City of Chicago had an occasion to have a conversation with one, A.W. F/B/ 14 yrs regarding evidence of the commission of Aggravated Criminal Assault, Aggravated Battery of a Child and Aggravated Assault by her adoptive mother, Emmaline WILLIAMS F/B apprx 43rs of [age] and at 6544 S. Damen, Chicago, Cook County, Illinois which is a single family dwelling and the only such dwelling at that location. A.W. related that on 15 JUNE 1985 at apprx 1:00AM she was in the family home at 6544 S. Damen mopping the kitchen floor. Her adoptive mother Emmaline WILLIAMS entered the kitchen and stated, 'You took all the shine off the floor—I'm gonna beat the shit out of you.' At this time the adoptive mother Emmaline WILLIAMS repeatedly struck the girl about the face and shoulders causing visible marks on the girl's face, neck and shoulders. Shortly thereafter the adoptive mother took the girl A.W. by the arm and pulled her into the bathroom. The adoptive mother told the girl that I'M gonna check you out and put petroleum jelly on her (Emmaline WILLIAMS) middle finger and told the girl to pull down her pants. The girl began to protest and the father (adoptive) Roy WILLIAMS walked into the bathroom. The adoptive mother, Emmaline WILLIAMS then pulled the girl into the bedroom and ordered the girl to lay down on the bed. At this time the girl, A.W. protested. ***. Then the adoptive mother, Emmaline WILLIAMS took a brown wooden cane and struck the girl with same until the girl layed down on the bed which is in the adoptive mother's bedroom. The adoptive mother then ordered the girl to pull down her pants and then attempted to insert her (Emmaline WILLIAMS') hand into the girl vagina. The girl struggled and was again struck with the cane by the adoptive mother. The girl then spread apart her legs upon the adoptive mother's command and the mother inserted her finger into the girl's vagina for several seconds. The girl related that she cried and that the adoptive mother stated 'Don't be afraid, I can't hurt you, I'm not a man.' According to the girl the adoptive mother then told the girl to get up and go finish mopping the kitchen floor,

this time using clear water so as not to ruin the shine.

The girl related that she then returned to the kitchen and that shorty thereafter the adoptive mother also returned to the kitchen. The girl then related that she could see a bulge in the adoptive mother's pocket which the girl similarly seen numerous times in the past and that she A.W. identified that bulge as the mother's gun. According to the girl the mother then pulled the gun which she described as a blue steel revolver and pointed the weapon at the girl for several moments as if to shoot the girl with the weapon. The girl then related that the mother then stated, 'I don't need this gun for you,' and them put the gun back into her pocket. The mother then picked up a kitchen knife and held same over her shoulder in a manner as if to throw same at the girl. Tanna BURGIN F/B/apprx 20yrs of age who is a daughter to the adoptive mother, Emmaline WILLIAMS, then yelled from her bedroom which is adjacent to the kitchen, 'Don't cut that girl.' The adoptive mother put down the knife and returned to her bedroom and the girl (A.W.) resumed cleaning the kitchen floor.

The girl (A.W.) through her old foster-mother reported the incident to the Dept. of Children & Family Services. Child Abuse hotline and undersigned Officer was notified. Upon hearing the girl's story undersigned Officer took the girl to Wyler Children's Hospital and the girl was examined by a Dr. Udervu. The Doctor verified injuries of old loop marks on the girl's shoulder, lacerations and bruising on the girl's face and neck and bruising the girl's legs and breast.

The girl (A.W.) related that she has seen her adoptive mother's gun on her (Emmaline WILLIAMS) person and in the house on numerous occasions and that the mother normally keeps the aforementioned cane in her (Emmaline WILLIAMS) bedroom. The girl left the home on 16 JUNE 1985 and the weapon was still there with the adoptive mother. In view of the above circumstances Reporting Officer feels that at 6544 S. Damen, Chicago, Cook County, Illinois there exists evidence of the aforementioned series of events and criminal offenses under the control of Emmaline WILLIAMS F/B/apprx 43yrs of age.

/S/   J. Lux 8927

COMPLAINANT

Subscribed and sworn to before me on this 17th day of JUNE at 5:10 P.M., 1985."